*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 12a0411p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

ERIE COUNTY, OHIO, individually and on
behalf of all entities similarly situated,
                    *Plaintiff-Appellant*,

      *v.*

MORTON SALT, INC. and CARGILL, INC.,
                    *Defendants-Appellees.*

No. 11-4153

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:11-cv-364—James G. Carr, District Judge.

Argued: October 10, 2012

Decided and Filed:  December 18, 2012

Before:  GILMAN, GIBBONS, and ROGERS, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Dennis E. Murray, Jr., MURRAY & MURRAY CO., L.P.A., Sandusky, Ohio, for Appellant.  David Marx, Jr., McDERMOTT WILL & EMERY LLP, Chicago, Illinois, for Appellees.   **ON BRIEF:** Dennis E. Murray, Jr., Charles M. Murray, Margaret M. Murray, Michael J. Stewart, MURRAY & MURRAY CO., L.P.A., Sandusky, Ohio, for Appellant.  David Marx, Jr., McDERMOTT WILL & EMERY LLP, Chicago, Illinois, Hugh R. McCombs, Kristin W. Silverman, MAYER BROWN LLP, Chicago, Illinois, G. Jack Donson, Jr., John B. Nalbandian, TAFT STETTINIUS & HOLLISTER LLP, Cincinnati, Ohio, Brian J. Wong, MAYER BROWN, LLP, Washington, D.C., Richard T. Prasse, HAHN LOESER & PARKS LLP, Cleveland, Ohio, for Appellees.

————————————

**OPINION**

————————————

**RONALD LEE GILMAN, Circuit Judge.**  This is a purported class action brought by Erie County, Ohio on behalf of itself and other counties in northern Ohio against Morton Salt, Inc. and Cargill, Inc.  Erie County claims that Morton and Cargill have conspired to fix the price of rock salt in northern Ohio by geographically dividing the market and excluding competition, in violation of Ohio's Valentine Act (Ohio Revised Code §§ 1331.01-1331.15), a state analogue to the federal antitrust statutes, including the Sherman Act (15 U.S.C. §§ 1-7).  The district court granted the defendants' motion to dismiss, finding that the facts alleged in the complaint are just as consistent with lawful parallel conduct as they are with a conspiracy.  On appeal, Morton and Cargill defend the court's dismissal of the complaint for failure to state a claim and argue that the court's decision may also be affirmed on the independent basis that Erie County lacks standing to sue.  Although we disagree with the analysis of the district court, we **AFFIRM** its judgment for the reasons set forth below.

**I.  BACKGROUND**

**A.  Duopoly in the northern Ohio rock-salt market**

The following facts are taken from the Second Amended Class Action Complaint (the complaint) and the documents that it relies on, which documents both parties urge us to consider.  *See Bassett v. Nat'l Coll. Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (holding that, on a motion to dismiss, a court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein").

Rock salt, also known as road salt, is larger and heavier than table salt.  Its size and weight keep it from being easily pushed off the road, and it is used to keep roads and bridges free of snow and ice during wintery weather.  The market for rock salt in Ohio

has two distinct segments: a market encompassing the 54 northern counties (known as the "Lake [Erie] market") and a market consisting of the southern 34 counties (known as the "[Ohio] River market"). Rock salt offered in the northern market comes primarily from mines near Lake Erie in Ohio, and rock salt offered in the southern market comes primarily from mines in Louisiana. The Ohio Department of Transportation (ODOT) is the largest purchaser of rock salt in Ohio. Members of the purported class—the northern Ohio counties—are, collectively, the second-largest in-state purchaser. ODOT is required to award contracts by soliciting sealed bids and choosing the lowest bid (subject to preferences for Ohio-mined salt, which will be discussed below). *See generally* Ohio Rev. Code § 125.11.

Morton and Cargill are the only two companies that operate salt mines located in Ohio. Morton is headquartered in Chicago and operates a salt mine in Fairport, Ohio. Cargill is headquartered in North Olmstead, Ohio and operates a salt mine in Cleveland. Together, the two companies supply at least 60 percent of the rock salt purchased in Ohio. Between 2001 and 2008, they supplied almost all of the rock salt purchased by government entities in northern Ohio.

During the fall and winter of 2008, the price of rock salt purchased by ODOT rose by as much as 300 percent compared to the previous year. (The Ohio Inspector General puts the price rise at between 19 and 236 percent; ODOT reports it as between 50 and 300 percent.) Ohio Governor Ted Strickland asked ODOT to investigate the causes of this dramatic price hike. ODOT responded by preparing a Bid Analysis and Review Team Report (the BART Report), which it submitted to the Governor in December 2008. The BART Report identified several potential causes for the price spike, including increased demand for salt due to a harsh winter; high transportation costs due to increased energy prices; and the structure of the state's contract system, which required suppliers to keep a large quantity of salt off the market and in reserve, thereby "suppress[ing] uncommitted supply" and increasing the price.

More to the point for purposes of the present case, the BART Report found that Morton and Cargill elected not to compete with each other, preferring instead to keep

to their own turf. This in effect created "county-by-county monopolies" where higher prices prevailed. Each company "bid in a way that most easily segmented the Ohio market into two monopolies, preventing competition and ensuring that neither firm would end up over-committing its supplies."

The BART Report also found that the state's "Buy Ohio" law favored Morton and Cargill, the only two companies offering salt mined in Ohio, over out-of-state competitors. According to the BART Report, when two firms offering Ohio-mined salt submitted a bid, ODOT's practice under the Buy Ohio law was to accept one of them—even if out-of-state bidders submitted cheaper bids. This "lockout" effect excluded outside competition and resulted in higher prices.

Prompted by the BART Report, the Ohio Office of the Inspector General initiated its own investigation in February 2009 and issued a report in January 2011 (the OIG Report). The OIG interviewed 27 people in conducting its investigation, including employees of Morton and Cargill, employees of their competitors, and state governmental officials. It also issued 14 subpoenas and other record requests to Morton and Cargill, and received nearly 190,000 pages of documents containing "road salt bidding, pricing, mine sourcing, stockpiling and transportation data" in response. The OIG consulted Dr. James T. McClave, a statistician and founder of Info Tech Inc., a company that the OIG Report described as "one of the nation's premier bid-analysis consulting firms," to help review and analyze this data. Because the complaint is largely based on the OIG Report, the Report's key findings are set forth below.

The OIG Report found that the exclusion of out-of-state competitors was not due to the Buy Ohio law itself, but was caused by ODOT's erroneous interpretation of the law. Under this law, if two or more companies offering Ohio-mined salt submit a bid on a contract, ODOT is required to award the contract to one of them, even if other bidders offering non-Ohio-mined salt submit cheaper bids—*but only if the lowest price for the Ohio-mined salt is no more than five percent above the lowest price for the non-Ohio-mined salt*. *See* Ohio Rev. Code § 125.11(B); Ohio Admin. Code § 123:5-1-06(C)(3).

From 2001 to 2008, ODOT gave no effect to this "excessive price" caveat. It instead read the law to require awarding the contract to one of two or more companies offering Ohio-mined salt, regardless of the price. Under this reading, if both Morton and Cargill, the only two companies offering Ohio-mined salt, submitted a bid, then all other companies were locked out of the competition, even if their bids were more than five percent lower. This lockout interpretation of the Buy Ohio law helped give rise to a duopoly in which Morton and Cargill ruled the northern Ohio market for state-government contracts in rock salt. "By applying the lockout interpretation when awarding salt contracts instead of the excessive-price interpretation," concluded the OIG Report, "ODOT has been an enabler in its own victimization."

But the OIG Report did not lay all the blame for noncompetitive rock-salt prices at ODOT's doorstep. It also found that Morton and Cargill had "engaged in anti-competitive market allocation practices" by "carv[ing] up" the market into two zones, with each company ruling its own zone and failing to mount a competitive challenge in the other's zone.

The OIG Report relied on "five indicators" to support its market-allocation conclusion:

1.  *Stable market shares.* In a competitive market, the market shares of firms would fluctuate as they win and lose in competition with rivals. Between 2000 and 2010, however, the market shares of Morton and Cargill were relatively stable. Morton's share of the northern Ohio market for rock salt was between 18 and 31 percent, and Cargill's was between 68 and 82 percent (a fluctuation of 13-14 percent). By contrast, in the southern Ohio market, Morton's share varied from 2 to 46 percent, and Cargill's from 33 to 98 percent (a fluctuation of 44-65 percent).

2.  *High incumbency rates.* In a competitive market, the rate of "incumbency" (the rate at which a bidder keeps winning the contracts it won last year) is not expected to be high, because business opportunities would attract entrants who seize the prize from the incumbent by offering better or cheaper products. But the 54 counties in the northern Ohio market experienced high incumbency rates: "Since 2000, the percentage of [northern]

Ohio counties with incumbent winning vendors has been as high as 98% (2009) and has never dropped below 68% (2008)." In some northern Ohio counties, the incumbency rate has been 100 percent for all but one of the bidding cycles between 2000 and 2010. By contrast, in the southern Ohio market, incumbency rates in the same period ranged from 95 to 20 percent.

3. *Suspicious bidding patterns.* Because transportation costs increase as one moves away from the location of a mine, and because the other costs of producing and mining salt are constant, each company would be expected to submit lower bids for counties that are closest to its mine and higher bids for counties that are farthest. Morton and Cargill would likewise be expected to each win more of the counties closest to its own mine. In fact, however, bidding patterns show that each company submitted lower bids in counties it had previously won and higher bids in counties the other company had won, regardless of the distance from its own mine, thereby cementing the geographic allocation of the market.

4. *Sham bids.* The bidding data showed that Morton and Cargill had each divided the northern Ohio market into "primary" and "secondary" counties. (Only Cargill used the "primary, secondary" terminology, but Morton followed the same two-tiered categorization.) Each company consistently bid low for its primary counties and high for its secondary counties. Indeed, they bid so high for their secondary counties that it seemed they were bidding to lose. The bids for secondary counties were so high that they would often lose even when the other company raised its prices by more than 25 percent. During the 2010-2011 season, Cargill won its primary counties 86.9 percent of the time and its secondary counties only 7.4 percent of the time; Morton won the counties that Cargill deemed secondary 79.6 percent of the time. When questioned about the practice of submitting consistently higher bids for secondary counties, Cargill employees told the OIG that they pursued those customers "passively" and that winning them would be "accidental." Similarly, Morton employees said that they bid for certain counties "more aggressively"; as for the other counties, they "would not expect to get" them and would be "surprised" if they did. Internal documents received from the companies also confirmed the practice of submitting consciously losing bids: "[B]id it high, let Morton . . . have it," advised a Cargill official in a July 2008 bid strategy report. "Bid it high so Morton can get what they did last year and maybe some more."

5.      *High prices and profits.*  Data received from Cargill indicated that Cargill's profit margins were as much as 4,000 percent higher in Ohio than in adjoining states.  Moreover, prices offered by Morton and Cargill in certain counties in northern Ohio were much higher than prices offered in nearby counties in other states, even where the out-of-state counties were farther from mines and thus subject to higher transportation costs.

Based on these five indicators, the OIG Report concluded that Morton and Cargill had geographically divided the northern Ohio market for rock salt, which drove up the price and ended up costing Ohio taxpayers between $47 million and $59 million in ODOT overpayments.  The Report noted, however, that the OIG had "failed to find evidence that the two companies communicated on salt bids."

**B.  This action**

Two weeks after the OIG Report was issued, Erie County sued Morton and Cargill.  The complaint is essentially a summary of the OIG Report, so the foregoing account of the Report adequately sets forth the thrust of the complaint.  In evaluating the allegations of the complaint, however, one must keep in mind that ODOT purchases salt in each of the 54 northern Ohio counties, including Erie County, but each of the 54 counties also makes separate purchases on its own behalf.  The OIG Report was focused on ODOT's purchases; this action, brought as it is by Erie County on behalf of all northern Ohio counties, focuses on the counties' purchases.  Accordingly, the complaint adds county-specific facts to those of the OIG Report.  The complaint in essence alleges that the defendants carried over the same practices and pattern of anticompetitive market allocation from the ODOT market to the county market.

Relying on the OIG Report, supplemented by county-specific information, the complaint asserts three claims against Morton and Cargill.  Erie County's first claim is that the defendants violated the Ohio Deceptive Trade Practices Act, Ohio Rev. Code § 4165.02, by misrepresenting the origin of their rock salt.  Second, based on the OIG Report's five indicators, the complaint asserts that the defendants conspired to fix the price of rock salt in northern Ohio in violation of the Valentine Act.  The final claim is

that the defendants committed fraud by intentionally inflating the price of rock salt and by representing that they were engaged in fair and competitive bidding when in fact they had colluded.

Erie County filed this action in Ohio state court. The defendants removed the case to the United States District Court for the Northern District of Ohio. They subsequently filed a motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint for failure to state a claim. The district court granted the defendants' motion to dismiss. With respect to the price-fixing claim, the court found the allegations to be just as consistent with lawful parallel conduct as with an unlawful conspiracy. The court held that the five indicators in the OIG Report "describe at length signs of an anticompetitive marketplace, but do not provide indicia of illegal collusion within that marketplace." And the defendants' duopoly and attendant high profits were found to be the result of the "marketplace's dysfunction" caused by ODOT's erroneous interpretation of the Buy Ohio law, not of any wrongdoing by the defendants. In sum, the court concluded that the "defendants' actions are at least as likely to be those of independent beneficiaries lawfully exploiting ODOT's erroneous anticompetitive interpretation as they are of unlawful conspirators in that same marketplace. Metaphorically, they . . . took their own shares of the manna that kept falling from Heaven." The court also dismissed the Deceptive Trade Practices claim for lack of standing and the fraud claim as vaguely pleaded and duplicative.

After the district court dismissed the complaint, Erie County filed a motion for reconsideration. The motion noted that Erie County had recently discovered—contrary to its previous "information and belief"—that the counties have never been bound by the Buy Ohio law, and argued that this newly discovered fact should change the district court's motion-to-dismiss ruling. But Erie County soon withdrew its motion for reconsideration and filed this appeal instead.

On appeal, Erie County challenges the district court's dismissal of the Valentine Act claim. It does not challenge the dismissal of the other two claims.

## II.  ANALYSIS

### A.  Standard of review

A district court's decision to grant a motion to dismiss for failure to state a claim is reviewed de novo. *Lambert v. Hartman*, 517 F.3d 433, 438–39 (6th Cir. 2008).  When deciding such a motion, we must construe the complaint in the light most favorable to the plaintiff and accept all factual allegations as true. *Id.* at 439.  We need not, however, accept conclusory allegations or conclusions of law dressed up as facts. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This standard demands that the factual allegations "raise a right to relief above the speculative level" and "nudge[] the[] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570.  It does not demand, however, that recovery be probable.  Rather, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).  In the final analysis, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### B.  Distinguishing motions to dismiss from summary judgment in the antitrust context

"Ohio has long followed federal law in interpreting the Valentine Act," *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 795 (Ohio 2005), and both parties have cited exclusively to federal jurisprudence interpreting the Sherman Act.  We will therefore analyze Erie County's Valentine Act claims by reference to federal law.

Section One of the Sherman Act, 15 U.S.C. § 1, prohibits unreasonable contracts, combinations, and conspiracies in restraint of trade. *Leegin Creative Leather Prods.,*

*Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007).  To state a Section One claim, a plaintiff must plead more than a restraint of trade; it must plead *an agreement* in restraint of trade. *Twombly*, 550 U.S. at 553 ("[T]he crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express.") (brackets and internal quotation marks omitted).  An agreement, either tacit or express, may ultimately be proven either by direct evidence of communications between the defendants or by circumstantial evidence of conduct that, in the context, negates the likelihood of independent action and raises an inference of coordination. *Brown v. Pro Football, Inc.*, 518 U.S. 231, 241 (1996); *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984).

Although an agreement may be inferred from circumstantial evidence, the bare fact that defendants engaged in parallel conduct is not sufficient to establish a Sherman Act violation:

> While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establishing agreement or itself constituting a Sherman Act offense.  Even conscious parallelism, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions[,] is not in itself unlawful.

*Twombly,* 550 U.S. at 553-54 (brackets, citations, ellipsis, and internal quotation marks omitted).

Accordingly, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice" to state an antitrust claim. *Id.* at 556.  Rather, allegations of parallel conduct "must be placed in a context that raises a suggestion of a preceding agreement." *Id.* at 557.  Examples of allegations that go beyond simple parallel conduct and that plausibly raise an inference of agreement include "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties"; "conduct that indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement"; and "complex and historically unprecedented

changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason" than to conform to a prior agreement. *Id.* at 556 n.4 (brackets and internal quotation marks omitted).

Of course, a plaintiff who states a plausible conspiracy claim is not guaranteed to survive a motion for summary judgment later in the case. "To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (internal quotation marks omitted).

The district court did not clearly distinguish between the antitrust standards applicable on summary judgment and those that apply to a motion to dismiss. Two points of clarification are in order.

*First*, at the pleading stage, the plaintiff is not required to allege facts showing that an unlawful agreement is more likely than lawful parallel conduct. The Supreme Court took pains to stress in both *Twombly* and *Iqbal* that what is required at the pleading stage is a plausible, not probable, entitlement to relief. *See Twombly*, 550 U.S. at 556 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.") (internal quotation marks omitted); *Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."); *see also Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011) ("Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage. [T]he plausibility of [the defendants'] reason for the refusals to sell carpet does not render all other reasons implausible."). A Section One complaint will survive a Rule 12(b)(6) motion to dismiss if it alleges facts sufficient to raise a plausible inference of an unlawful agreement to restrain trade.

*Second*, in order to state a Section One claim, a plaintiff need not allege a fact pattern that "tends to exclude the possibility" of lawful, independent conduct. The "tends to exclude" language traces its provenance to *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984), and *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986), which were both decisions dealing with summary judgment and the standard of proof required to submit an issue to the jury. In restating the same language, the Supreme Court in *Twombly* was mindful of those decisions' procedural context, *see* 550 U.S. at 554, and nowhere held that the same standard applies on a motion to dismiss. And there is no authority cited by either the parties or the district court for extending the same standard to the pleading stage.

To the contrary, the only circuit court of appeals that to our knowledge has considered such an extension has rejected it, and so has the leading treatise in the field. *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010) ("Defendants first argue that a plaintiff seeking damages under Section 1 of the Sherman act must allege facts that tend to exclude independent self-interested conduct as an explanation for defendants' parallel behavior. This is incorrect.") (brackets, citation, and internal quotation marks omitted); 2 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 307d1 at 118 (3d ed. 2010) (hereinafter Areeda & Hovenkamp) ("Observe that the Supreme Court [in *Twombly*] did *not* hold that the same standard applies to a complaint and a discovery record, with the only difference being that the former involves alleged facts while the latter involves facts in evidence. The 'plausibly suggesting' threshold for a conspiracy complaint remains considerably less than the 'tends to rule out the possibility' standard for summary judgment.") (emphasis in original).

The rationale for rejecting such an extension is clear: If a plaintiff were required to allege facts excluding the possibility of lawful conduct, almost no private plaintiff's complaint could state a Section One claim. Rational people, after all, do not conspire in the open, and a plaintiff is very unlikely to have factual information that would exclude the possibility of non-conspiratorial explanations *before* discovery. Accordingly, the regular motion-to-dismiss standard should apply.

Under this standard, the question before us is: Do the factual allegations point to nothing more than parallel conduct of the sort that is the product of independent action, or do they plausibly raise an inference of unlawful agreement? *See Twombly*, 550 U.S. at 553. That is the question to which we will now turn.

## C.  Failure to state a claim

As discussed above, Erie County claims that the five "indicators," copied from the OIG Report, nudge this case over the line from mere parallel conduct to conspiracy: (1) stable market shares; (2) high incumbency; (3) suspicious bidding patterns (failing to bid lower in geographically closer locations); (4) sham bids (submitting high, losing bids in secondary territories); and (5) high prices and profits. We must consider these factors together, not in isolation, to determine whether they give rise to a plausible inference of conspiracy. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962).

The first, second, and fifth factors are simply descriptions of the market, not allegations of anything that the defendants did. Standing alone, they indicate only that the market is a duopoly, and do not give rise to an inference of an unlawful agreement (though they might, when combined with the other factors, strengthen the plausibility of such an inference).

The third and fourth factors are the nub of the complaint. With respect to the third factor, Erie County faults the defendants for failing to grab allegedly plum business opportunities. As the complaint puts it, "[s]uspicious bidding patterns occurred when the Defendants failed to seek bids that would generate higher profit margins, i.e., when the Defendants would contract with a county that is farther from their mine or stockpile instead of a county that is closer to their salt source." The argument, in other words, is that because the product being sold is homogenous and fungible, and because all costs except for transportation are constant, the defendants' failure to aggressively compete and bid low for accounts that are closer to their respective mines signifies a "fail[ure] to seek bids that would generate higher profits."

But this is exactly the sort of failure-to-compete claim that *Twombly* rejected. In that case, the plaintiffs attacked the defendant telecommunications firms' "common failure meaningfully to pursue attractive business opportunities in contiguous markets where they possessed substantial competitive advantages."  550 U.S. at 551 (brackets and internal quotation marks omitted).  The plaintiffs in *Twombly* claimed that the defendants' decision to remain in their respective local telephone and Internet-services territories and to not encroach on each other's territories, which resulted in a market that remained "highly compartmentalized geographically, with minimal competition," was indicative of a prior agreement to restrain trade.  *Id.* at 551, 567.  In holding that these allegations of failure to compete and geographical compartmentalization did not state a Section One claim, the Supreme Court reasoned:

> In a traditionally unregulated industry with low barriers to entry, sparse competition among large firms dominating separate geographical segments of the market could very well signify illegal agreement, but here we have an obvious alternative explanation.  In the decade preceding the 1996 [Telecommunications] Act and well before that, monopoly was the norm in telecommunications, not the exception. [The defendants] were born in that world, doubtless liked the world the way it was, and surely knew the adage about him who lives by the sword. Hence, a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing.
>
> . . . Not only that, but even without a monopolistic tradition and the peculiar difficulty of mandating shared networks, "[f]irms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets."

*Id.* at 567-69 (citations omitted) (quoting Areeda & Hovenkamp ¶ 307d at 155 (Supp. 2006)).

Just as in *Twombly*, the failure to compete alleged in this case is indicative of no more than a natural and independent desire to avoid a turf war and preserve the profits guaranteed by regional dominance.  Morton and Cargill presumably realize, like the defendants in *Twombly*, that their interests are best served by keeping to their own turf

and charging oligopoly prices rather than stepping on each other's toes and provoking a bidding war that would lead to competitive prices and reduced profits. This is no more than an independent, self-interested failure to compete, which does not violate Section One. *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010) (Posner, J.) (explaining that Section One "does not require sellers to compete; it just forbids their agreeing or conspiring not to compete").

But the fourth factor that the complaint takes from the OIG Report alleges something more. The claim is not only that Morton and Cargill failed to enter each other's turf, but also that they helped each other rule their respective turf by submitting intentionally losing bids that served to exclude their out-of-state competitors. This is significant because, under the then-prevailing interpretation of the Buy Ohio law, all out-of-state bidders were locked out—their bids would not even be considered, no matter how much cheaper—if both Morton and Cargill submitted a bid for a particular contract. A crucial difference therefore existed between one of the two companies' submitting a losing bid and not submitting a bid at all: only in the former case was the other company guaranteed to win the contract. The intentional submission of a losing bid under these circumstances does not make sense if it merely signifies a lack of interest in winning the contract; if that were the motivation, the company would presumably not bid at all. The practice makes sense only as a device to help *the other company* rule its territory.

Not to compete with a fellow oligopolist is one thing; to actively assist the fellow oligopolist to preserve its oligopoly is quite another. Unlike the failure to compete, the submission of losing bids has no obvious independent justification. Why, after all, should Cargill care if Morton or some other company prevails in a county that is of no interest to Cargill anyway (and vice versa)? The most plausible explanation is the expectation of a "tit for tat"; i.e., that I will guarantee your dominance in your primary zone by submitting a high bid that is guaranteed to lose but will lock out your other competitors, and in return you will exclude my competitors by submitting a losing bid in my primary zone. This kind of tit-for-tat arrangement would be extremely difficult to sustain in the absence of at least a tacit agreement. *See* 6 Areeda & Hovenkamp

¶ 1420b at 154 ("A strong inference of coordinated behavior arises when a participant actively seeks to lose a bid. Deliberate sacrifice of a contract implies an unusual confidence that the winning party will return the favor. Moreover, spurious bidding indicates an awareness of wrongdoing coupled with a desire to hide it by simulating normal bidding. A spurious bid is almost always anticompetitive."); *see also id.* ¶ 1420d1 at 158 ("Interdependent sham bids are unlikely to endure without some facilitating mechanism . . . .").

A sham-bidding conspiracy would therefore not be implausible. Its plausibility, however, hinges on the applicability of the Buy Ohio law. Without the Buy Ohio law, as then interpreted by ODOT, the incentive to collude evaporates because the sham bidding would not lock out any competitors.

Although the complaint does not specifically allege that Erie County was bound by the Buy Ohio law, the district court and the defendants assumed that it was so bound, perhaps because the entire theory of the conspiracy laid out in the complaint rested on ODOT's lockout interpretation of the Buy Ohio law. But, after the district court dismissed the complaint, Erie County acknowledged for the first time that in fact it was never bound by the Buy Ohio law. In a subsequently withdrawn motion for reconsideration filed after the complaint was dismissed, Erie County stated:

> While indirectly harmed by Defendants' lock-out bidding to ODOT that excluded out-of-state bidders, it is now clear that . . . Plaintiff's "information and belief" about Class Members' application of the Buy Ohio program was not correct. Subsequent to the preparation of the Complaint, Plaintiff has been collecting and analyzing additional bidding information from counties included in the purported class. To date, none of these counties, including Erie County, has indicated that they opted to participate in the equivalent of the Buy Ohio program.

Erie County reiterated in its opening appellate brief that "[l]ocal governments are free to participate in 'Buy Ohio,' but are not required to." And counsel for Erie County assured us again at oral argument that "they weren't subject to the Buy Ohio" law.

Erie County's concession that it was not bound by the Buy Ohio law dooms its conspiracy claim. As explained above, the allegation of sham bidding is the only thing that could save the present case from dismissal under *Twombly*. And the theory of sham bidding makes sense only in a market subject to the lockout interpretation of the Buy Ohio law. If a purchaser of rock salt is not bound by the Buy Ohio law, then it is free to solicit and receive bids from out-of-state companies without having its choices limited to Morton and Cargill, and sham bidding would therefore be an exercise in futility. The conspiracy claim, in other words, would be implausible in a market that is not subject to the Buy Ohio law.

Erie County attempts to extricate itself from this predicament by arguing that, although it did not adopt ODOT's interpretation of the Buy Ohio law, it was "indirectly" harmed by the defendants' exploitation of that law because the defendants "were able to leverage the distortions created by Buy Ohio in state contracts into a similar allocation of county and municipal contracts." "The resulting environment of high and distorted price[] levels combined with limited competition allowed the suppliers to carry out much the same scheme on the county and municipal level."

Erie County's claim of indirect harm by "leveraging" is unpersuasive. Its arguments as to how this supposed leveraging worked are vague and do not spell out a meaningful theory. If the theory is that Morton and Cargill leveraged their monopoly power in segments of the ODOT market to create monopolies in segments of the county market, that would appear to be a Sherman Act Section Two (monopolization-type) claim, not a Section One claim. Such a claim would require elements that are not pleaded in the complaint, including "a dangerous probability of success in monopolizing a second market." *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 415 n.4 (2004) (internal quotation marks omitted).

The complaint also advances the following claim of "indirect" harm:

> As a result [of ODOT's continued misapplication of the Buy Ohio law], the majority of Ohio's market for road salt was removed from competition by parties other than Defendants which made the remainder of the market less dense and therefore less susceptible to effective

competition.  Because this allowed Defendants to dishonestly cite to supra-competitive prices paid by ODOT as really being competitive prices, Defendants made the rest of the market more susceptible to anticompetitive conduct including collusion, price-fixing and bid rigging.

But none of this adds up to a Section One claim.  The complaint's theory that any sham bidding with respect to ODOT purchases made *other markets* (what Erie County calls "the remainder of the market") "less dense and therefore less susceptible to effective competition" simply does not follow.  After all, how are other markets linked to the ODOT market?  Erie County does not tell us, and its conclusory say-so does not satisfy the standard of plausible pleading.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that plausible pleading "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation") (internal quotation marks omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 555 n.3 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . .  Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief.") (brackets and internal quotation marks omitted).

Nor is the complaint salvaged by the contention that sham bidding in the ODOT market "allowed Defendants to dishonestly cite to supra-competitive prices paid by ODOT as really being competitive prices."  "Dishonestly citing"—better known as misrepresentation—is not an antitrust claim.  *See generally Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.") (internal quotation marks omitted).  The fraud claim was dismissed below and never appealed, and is therefore not before us.  In short, because it is not bound by the Buy Ohio law, Erie County has failed to state a plausible conspiracy claim.

Although both parties have characterized Erie County's not being bound by the Buy Ohio law as an issue of "standing," we have elected to treat it as an issue of failing to state a claim because the significance of Erie County's not being bound by the Buy Ohio law can be understood only after analysis of the complaint's substantive allegations of conspiracy. In any event, the analysis and its outcome would be no different if conducted under the rubric of standing. *Cf. Rakas v. Illinois*, 439 U.S. 128, 139 (1978) ("We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed [in this case] is more properly subsumed under substantive Fourth Amendment doctrine. . . . The inquiry under either approach is the same. But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.").

Finally, although the fact that Erie County is not bound by the Buy Ohio law came up after the district court's decision, the impact of that fact is properly considered on appeal because the resolution of the case is beyond doubt. *See DaimlerChrysler Corp. Healthcare Benefits Plan v. Durden*, 448 F.3d 918, 922 (6th Cir. 2006) (holding that this court "will consider an issue not raised below" when "the proper resolution is beyond doubt"). With the outcome clear in light of this newly discovered fact, there is no point in wasting the resources of either the parties or the district court by ordering a remand. *See, e.g.*, *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 88 (1943) ("It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate."); *Beaty v. United States*, 937 F.2d 288, 291 (6th Cir. 1991) ("Here, the record is complete, and it would be a waste of everyone's time to remand to the district court what can be decided now as a matter of law.").

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.