NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0760n.06

Nos. 12-2530, 12-2588

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| PATRICK J. DEVLIN | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| RICHARD S. KALM; FREDERICK F. | ) | THE EASTERN DISTRICT OF |
| CLELAND; ERIC T. BUSH; DALE E. | ) | MICHIGAN |
| BEACHNAU; MICHEAL DAVIS; | ) | |
| DOMINICK P. ALAGNA, | ) | |
| | ) | |
| **Defendants-Appellants.** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JANET M. MCCLELLAND, | ) | |
| | ) | |
| **Defendant.** | ) | |

FILED
*Aug 15, 2013*
DEBORAH S. HUNT, Clerk

Before: GIBBONS, SUTTON, and KETHLEDGE, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge**. The Michigan Gaming Control Board ("Board") terminated Patrick Devlin after he filed "whistleblower" lawsuits and made comments in the press accusing state officials of lax enforcement of liquor licensing laws against tribal casinos. He filed suit pursuant to 42 U.S.C. § 1983 against officers from the Board, the Michigan Department of the Treasury, and the Michigan Civil Service Commission, alleging violations of the First and Fourteenth Amendments. In this appeal—the third in this case—the defendants challenge the district court's denial of their motion to dismiss certain claims on qualified immunity grounds. For the

reasons that follow, we affirm the district court's judgment with respect to Devlin's First Amendment retaliation claim, reverse its judgment with respect to Devlin's procedural due process claim, and remand for further proceedings.

**I.**

The facts relevant to this appeal are set forth in Devlin's first amended complaint, which we summarize below. Because this appeal arises from the denial of a motion to dismiss, we accept the complaint's well-pled facts as true. *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 867 (6th Cir. 2012).

Devlin joined the Board in September 2001 as the sole compliance officer for the Indian Gaming Section, which monitors "the [nineteen] Michigan tribal casinos' compliance with the Tribal-State gambling Compacts, applicable federal law, and applicable tribal ordinances." During his tenure, Devlin grew concerned about the Board's reluctance to address "violations of law" by tribal casinos. He alleges that he cited casinos "for not posting card rules in each room and for continuously conducting unauthorized promotional lotteries." He also asserts that his supervisors prevented him from investigating other violations of the law by tribal casinos, including failure to comply with liquor licensing laws, and that the tribes had complained to the Governor's Deputy Legal Advisor for Indian Affairs and Eric Bush, Devlin's supervisor at the Board, about Devlin's investigations. Devlin outlined these issues in a meeting with the recently appointed executive director of the Board, Richard Kalm, on July 30, 2007. After the meeting, Devlin alleges that "Kalm

sent [him] a [m]emo referring to pending grievance matters and threatening to find [him] insubordinate, applying sanctions up to and including termination from employment."

In "late 2007," Kalm posted notice that the Board's Licensing Division was looking for a new Deputy Director. Devlin applied for the job, but the Board chose Kalm's friend Fred Cleland for the position instead. Devlin filed a grievance in response to being passed over for the position on February 14, 2008. He filed another grievance on May 29, 2008, after Kalm and Cleland informed him that they would be transferring him to the Board's licensing division, which was in the process of being moved from Lansing to Detroit.

On June 3, 2008, not long after he filed the second grievance, Devlin filed two "whistleblower" lawsuits in Ingham County Circuit Court. The first was a *mandamus* action against Michael Cox, Michigan's Attorney General at the time. This lawsuit asked the court to order Cox to "enforce the liquor laws against tribal casino management . . . either by bringing civil injunctive lawsuits or by bringing felony prosecutions." The second lawsuit was brought against the Board, the Michigan Civil Service Commission, and the Michigan Department of the Treasury. It alleged that officials in these departments did not comply with Michigan's merit selection system for civil servants when they selected Cleland for the Deputy Director position. Both suits were eventually dismissed by the Michigan courts, but the court did not reach the substance of Devlin's claims in either case. *Devlin v. Civil Service Comm'n*, No. 287826, 2010 WL 480996, at *3–4 (Mich. Ct. App. Feb. 11, 2010) (affirming lower court's determination that it lacked subject-matter jurisdiction over Devlin's claim for failure to exhaust administrative remedies); *Devlin v. Attorney Gen.*, No. 287827,

2010 WL 199605, at *2–3 (Mich. Ct. App. Jan. 21, 2010) (denying *mandamus* for failure to show

a particularized right to enforcement of gaming laws against tribal casinos).

Devlin admits that he made comments about his state-court lawsuits to the print media,

including the *Detroit Free Press*, in stories that were published on June 4 and 5. On June 4, the *Free*

*Press* ran a story about the lawsuits that reported Devlin's comments:

> "Bars, restaurants and even the Detroit commercial casinos incur expenses for applying for and obtaining a liquor license and supplying liquor liability insurance or a bond," Devlin said in a statement. "They are also subject to frequent law enforcement checks and stings, and must pay fines and face liquor suspensions or revocations and the costs associated therewith if they violate the law. Tribal casinos incur none of these costs or sanctions."
>
> Devlin called Cox a "deadbeat" when it comes to enforcement actions against the tribes.
>
> "While the attorney general has 'zero tolerance' for all kinds of conduct, he apparently has 'unlimited tolerance' for tribal casino violations: he just gives them a free pass," Devlin said.
>
> Devlin said one tribal casino had not been audited by the state for nine years, and Cox did little to force it to turn over operating records to the state for inspection.

Jennifer Dixon, *Official Sues State AG Over Tribal Casino Liquor Sales*, Detroit Free Press, June

4, 2008.

The Board suspended Devlin's employment on June 6, the day after the defendants in the two

"whistleblower" suits were served and two days after the *Free Press* article ran. Bush, Devlin's

supervisor, requested an investigation of Devlin and expressed concerns about confidential

information contained in the story and the caustic remarks about the Attorney General's enforcement

of the law. He wrote that Devlin had been disciplined for inappropriate behavior on previous

occasions and that these continued violations of Board policy were interfering with the Board's work.

Dale Beachnau, a human resources manager for the Department of Treasury and the Board, sent a letter to Devlin on June 19, requesting his appearance at an investigatory conference on June 25 "to respond to questions related to your involvement and conduct in the access and release of confidential information, failure to follow the chain of command, insubordinate behavior, [and] disrespectful conduct." The conference attendees were Devlin and his representative; Micheal Davis of the Treasury Department; and Dominick Alagna of the Board. Devlin acknowledges that the meeting took place but asserts he was asked "very few questions" by Alagna and Davis.

On July 11, Davis sent Devlin a "Notice of Disciplinary Conference." This conference took place on July 24. Before the conference, Devlin sent a detailed letter setting forth his views about the disciplinary proceedings to all of the defendants in this action. In the letter, he acknowledged that the content of the newspaper articles and the lawsuits was the basis for the Board's disciplinary actions and argued that the Board was acting unlawfully by terminating him in response to his "whistleblower" lawsuits and comments to the press.

At the July 24 conference, Davis terminated Devlin's employment and gave Devlin a letter summarizing the reasons for that decision, along with a copy of Bush's memorandum requesting an investigation. When Devlin asked why he was being terminated, Davis told him it was because he had told the press Cox was "a deadbeat when it came to enforcement of Indian related matters" and had disclosed "confidential information" about law enforcement practices against the Indian casinos. On January 31, 2008, Devlin had signed an "annual affirmation and disclosure statement" in which

he promised he would "not disseminate or otherwise disclose any material or information in the possession of the [Board] that is confidential under the [Michigan Gaming Control and Revenue Act] or determined to be confidential by the [Board]" without prior authorization. Devlin denies that his disclosures violated any confidentiality agreement.

**II.**

Devlin filed his federal court complaint on August 8, 2008, a few weeks after his formal termination from the Board. The complaint named Kalm, Cleland, Bush, Beachnau, Davis, and Alagna as defendants. It also named Janet McClelland, the State Personnel Director for the Michigan Civil Service Commission, as a defendant. Devlin alleges that McClelland "had the final appeal on personnel termination decisions." On September 8, all of the defendants, with the exception of McClelland, moved to dismiss the complaint for lack of jurisdiction on the basis of the abstention doctrine of *Younger v. Harris*, 401 U.S. 37 (1971). Three days later, McClelland filed her own motion to dismiss which argued that the complaint failed to make any substantive allegations against her and, in the alternative, joined the *Younger* abstention argument made by the other defendants. Neither motion raised the issue of qualified immunity. The district court granted both motions on March 18, 2009 on the basis of *Younger* abstention. Devlin appealed, and we vacated the district court's judgment and remanded for further proceedings. *Devlin v. Kalm*, 594 F.3d 893 (6th Cir. 2010) (*Devlin I*).

On remand, the defendants renewed their motion to dismiss the complaint, with McClelland again filing a separate motion. The motion joined by all of the defendants except McClelland argued that the complaint should be dismissed on the basis of Eleventh Amendment immunity; qualified

immunity; standing; inability to meet the requirements for injunctive relief; failure to exhaust administrative remedies; abstention under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943); and abstention under *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976). McClelland repeated the argument she made in her initial motion to dismiss about Devlin's failure to state a claim against her and otherwise joined in the arguments made by her co-defendants. After responding to the motions, Devlin filed an amended complaint. The defendants moved to dismiss the amended complaint, arguing that with the exception of some alterations in the factual allegations against McClelland, there was no material difference between the amended complaint and the original complaint. The district court granted the motions to dismiss on the basis of *Burford* and *Colorado River* abstention. Devlin appealed again, and we again reversed. *Devlin v. Kalm*, 493 F. App'x 678 (6th Cir. 2012) (*Devlin II*).

After the second remand, the defendants filed another round of motions to dismiss. These motions sought relief for the reasons given in the second set of motions to dismiss with the exception of the abstention theories. The district court denied both motions "without prejudice" and ordered the parties to begin discovery without considering the merits of the defendants' arguments. The defendants filed a notice of appeal to challenge the district court's denial of qualified immunity on the same day the district court entered its order.

**III.**

We review a district court's order denying a motion to dismiss based on qualified immunity *de novo*. *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680 (6th Cir. 2011). At this stage of the case, we must "construe the complaint in the light most favorable to the plaintiff, accept its

allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). The plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant[s are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If Devlin cannot "nudge[] [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Devlin's complaint mentions a number of documents that are critical to a proper understanding of his claims. The defendants attached many of these documents to their motions to dismiss in the district court, and rely on these documents on appeal. Devlin asserts that such reliance is improper, but he is incorrect. "When a court is presented with a Rule 12(b)(6) motion, it may consider . . . exhibits attached to defendant's motion to dismiss so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *accord Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001). Devlin's complaint refers to the *Free Press* story, Bush's memorandum requesting an investigation of Devlin, Beachnau's letter requesting an investigative conference, Davis's letter regarding the disciplinary conference where he was terminated, Devlin's seven-page letter to the defendants responding to the charges against him, and Davis's letter formally notifying Devlin of his dismissal. We will therefore take these documents into account when evaluating Devlin's complaint.

**IV.**

The defendants argue that the district court improperly denied their motions to dismiss on qualified immunity grounds. The district court's refusal to address the merits of this defense below does not preclude us from considering it. On prior occasions, we have addressed qualified immunity in the first instance after the district court declined to consider the defense on the grounds that further discovery was necessary. *See Summers v. Leis*, 368 F.3d 881, 886–88 (6th Cir. 2004); *Skousen v. Brighton High Sch.*, 305 F.3d 520, 527–30 (6th Cir. 2002). Because the defendants' appeal presumes the truth of the plaintiffs' allegations and the parties have fully briefed the qualified immunity issues, we will take up the merits of the defendants' entitlement to qualified immunity

In order to overcome the defendants' assertion of qualified immunity, Devlin must show that the defendants (1) violated his constitutional rights and (2) that those rights were clearly established at the time the incidents described in the complaint took place. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). We may decide that the defendants are entitled to qualified immunity by answering either one of these questions in the negative. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "The ultimate burden of proof is on the plaintiff to show that the defendant[s are] not entitled to qualified immunity." *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000). "Clearly established" rights must be defined at an "appropriate level of generality" to avoid "collapsing the two qualified-immunity inquiries into one" without being so narrow that no violation can ever be found. *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508–509 (6th Cir. 2012). The test "afford[s] . . . 'ample protection to all but the plainly incompetent or those who knowingly violate the law.'" *Guercio v. Brody*, 911 F.2d 1179, 1185 (6th Cir. 1990) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

**A.**

Devlin asserts that the defendants violated the First Amendment by terminating his employment after he filed the "whistleblower" lawsuits and commented to the media about the failure of the Board and the Attorney General to enforce liquor licensing law against tribal casinos. In the context of public employment, "a state is afforded greater leeway to control speech that threatens to undermine the state's ability to perform its legitimate functions." *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003). There are four parts of a successful claim that "a public employer has violated the First Amendment by firing a public employee for engaging in speech." *Id.* First, the plaintiff's speech is only entitled to protection if it "addressed a matter of public concern." *Id.* (citing *Connick v. Myers*, 461 U.S. 138, 143 (1983)). Second, the plaintiff must show that the speech was made "outside the duties of employment." *Garcetti v. Ceballos*, 547 U.S. 410, 424 (2006). Third, "the court must balance the interests of the public employee, 'as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Rodgers*, 344 F.3d at 596 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). Fourth, the plaintiff must show this his "speech was a substantial or motivating factor" in the employer's decision to terminate him. *Id.*

The defendants do not dispute that Devlin's comments were "a substantial or motivating factor" in his termination or that his comments were made outside his duties as an employee of the Board. They argue on appeal that (1) Devlin's comments were not directed to matters of public concern and (2) to the extent they were, Devlin's termination was still justified under *Pickering*'s balancing test.

**1.**

Speech touches an area of public concern when it "'involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.'" *Rodgers*, 344 F.3d at 596 (quoting *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001)) (internal quotation marks omitted); *see also City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004) (*per curiam*) ("[P]ublic concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication."). This test examines the content of speech, rather than its motivations. *Farhat v. Jopke*, 370 F.3d 580, 591 (6th Cir. 2004). The speech in question does not have to be entirely directed to a question of public concern in order to merit protection "as long as some portion of the speech does so." *Id.*

The defendants focus on Devlin's reference to the Attorney General as a "deadbeat" and his disclosure of confidential information about casino licensing and audit practice to show that his speech did not address a "public concern." This argument is problematic for two reasons. First, subdividing Devlin's comments and attacking them without reference to their overall context is not the proper way to analyze whether those statements address matters of public concern. We must review the "content, form, and context of a given statement, as revealed by the whole record," *Connick*, 461 U.S. at 147–48, and even speech that partially touches on matters of public concern can form the basis of a retaliation claim, *Farhat*, 370 F.3d at 589. Second, Devlin's speech does not cease to be a matter of "public concern" because he used mildly abrasive language or violated a confidentiality agreement. Placing undue weight on such considerations may lose "the essence of

the inquiry," which is to determine "the communicative purpose of the speaker." *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1188 (6th Cir. 1995).

Read in full, Devlin's comments to the *Free Press* constitute legitimate criticism of perceived law enforcement shortcomings. "The public has a vital interest in the integrity of those commissioned to enforce the law." *Brockell v. Norton*, 732 F.2d 664, 668 (8th Cir. 1984); *see also Connick*, 461 U.S. at 149 (recognizing that it is "essential that public employees be able to speak out freely" about issues of integrity in government). We have held on numerous occasions that allegations of impropriety by law enforcement officials satisfy the public concern test. *See, e.g.*, *See v. City of Elyria*, 502 F.3d 484, 487 (6th Cir. 2007) (finding plaintiff engaged in protected speech when he "contacted the FBI to report alleged illegal or immoral activity within the police department"); *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986) ("Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law."). These cases demonstrate that Devlin's comments about the failure of the Board and the Attorney General to enforce the law evenhandedly against tribal casinos address an issue of "public concern" under clearly established federal law.

**2.**

Because Devlin's comments were directed to an area of "public concern," we must "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. Under *Pickering*, the court "consider[s] whether an employee's comments meaningfully interfere with the performance of [his]

duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir. 1994). "In performing the balancing, the statement[s] will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987).

To answer this question in the qualified immunity context, we begin by asking whether the complaint alleges a constitutional violation. The defendants do not dispute that "'[s]tatements exposing possible corruption in a [government agency] are exactly the type of statements that demand strong First Amendment protection." *City of Elyria*, 502 F.3d at 493 (collecting other Sixth Circuit cases expressing this view). All whistleblowers create some disruption and "it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office." *Porter v. Califano*, 592 F.2d 770, 773–74 (5th Cir. 1979); *see also Rivero v. City & Cnty. of San Francisco*, 316 F.3d 857, 866 (9th Cir. 2002) (noting that a state's interest in preventing workplace disruption "does not weigh as heavily against whistleblowing speech as against other speech on matters of public concern"); *Lytle v. City of Haysville, Kansas*, 138 F.3d 857, 865 (10th Cir. 1998). Moreover, whistleblowing often brings to light troubling practices that might not otherwise be exposed to public view and could actually serve "to aid the government's interest in efficiency." *Akins v. Fulton Cnty., Georgia*, 420 F.3d 1293, 1304 (11th Cir. 2005). Taking Devlin's complaint at face value, his interests in speaking appear to be quite strong under *Pickering*.

In response, the defendants must demonstrate that the "potential disruptiveness" of Devlin's speech "was enough to outweigh whatever First Amendment value it might have had" in order to overcome his right to engage in whistleblowing speech. *Waters v. Churchill*, 511 U.S. 661, 681 (1994); *see also id.* at 674 ("In many such situations the government may have to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished."); *Rankin*, 483 U.S. at 389 (agreeing that plaintiff's employment was unlawfully terminated, in part, because there was "no evidence that [a statement plaintiff made] interfered with the efficient functioning of the office"). This is a context-specific determination. Courts examine "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388. On prior occasions, we have denied summary judgment to public employers for failure to produce evidence of potential disruption.[1] In addition, the government must make a " particularly strong showing that the employee's speech interfered with workplace functioning" if the speech

---

[1]*Rodgers*, 344 F.3d at 601 ("Defendant bears the burden of demonstrating that legitimate grounds existed justifying the termination."); *Miller v. City of Canton*, 319 F. App'x 411, 418 (6th Cir. 2009) ("[T]here is no evidence that the plaintiff's speech actually disrupted working relationships or affected the Department's proper functioning."); *City of Elyria*, 502 F.3d at 493 ("Other than [the defendant's] own statement to another officer . . . there is no evidence that [plaintiff's] complaints to the FBI actually impeded the police department's general performance and operation or affected loyalty . . . ."); *Solomon v. Royal Oak Twp.*, 842 F.2d 862, 866 (6th Cir. 1988) (holding that termination decision did not pass the *Pickering* balancing test because "[d]efendants did not submit substantial evidence that [the plaintiff's] statements caused conflict or disruption, or that they impeded the department's normal operation").

"'substantially involved matters of public concern,'" as Devlin's speech did. *Leary v. Daeschner*, 228 F.3d 729, 737–38 (6th Cir. 2000) (citing *Connick*, 461 U.S. at 150–52).

The defendants have failed to show that their interests in the efficient operation of government outweighs Devlin's First Amendment rights. In their brief, the defendants make highly generalized and unsupported claims about the impact of Devlin's statements. They assert that Devlin interfered with the Board's ability to work with the Attorney General, disobeyed orders from his superiors, and violated the terms of his confidentiality agreement. In *Pickering*, the Supreme Court recognized that when a public employee's job requires significant confidentiality or "personal and intimate relationships" between superiors and subordinates, the employer may have far greater leeway to dismiss an employee even for completely truthful public statements. *Pickering*, 391 U.S. at 570 n.3. But this court and the Supreme Court have demanded that employers put on evidence that an employee's comments actually compromised a significant need for confidentiality or threatened to disrupt critical working relationships. *See Rankin*, 483 U.S. at 389; *City of Elyria*, 502 F.3d at 493 (rejecting claims of qualified immunity because defendants failed to produce evidence of disruption at the summary judgment stage). The amended complaint and documents mentioned therein do not provide enough information about the dynamics of the Board's work or the impact of Devlin's statements to validate the defendants' generalized concerns. Accordingly, we find that the complaint adequately alleges a violation of Devlin's constitutional rights.

We next consider whether Devlin's complaint pled a violation of "clearly established" law. *Pickering* requires a "context-intensive, case-by-case balancing analysis" from which it is difficult to draw clearly established principles of law. *Moran v. Washington*, 147 F.3d 839, 847 (9th Cir.

1998) (collecting cases and noting "the difficulty of divining clearly established law from multifactor balancing tests"). Nonetheless, while officers will often be entitled to qualified immunity under *Pickering*, this will only be evident after an opportunity for discovery so that the court can know "what is being balanced against what." *Evans-Marshall v. Bd. of Educ.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring). "Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is 'obvious' or 'squarely govern[ed]' by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not." *Id.* Defendants in this court are frequently denied summary judgment because of a failure to produce evidence that would permit the court to strike the *Pickering* balance in their favor. *See supra* note 1. This suggests that at the motion-to-dismiss stage—where facts outside the complaint cannot be considered and the plaintiff's allegations must be accepted as true—it will rarely be possible to determine whether a defendant's actions were clearly unlawful.

This is not to suggest that it will *never* be possible to recognize qualified immunity on a *Pickering* claim at the pleadings stage. We did so in *Guercio v. Brody*, 911 F.2d 1179 (6th Cir. 1990). The plaintiff in *Guercio*, a judicial secretary, sent copies of old newspaper articles to various federal authorities tasked with investigating judicial nominees that accused a new appointee to the bankruptcy court of representing organized crime figures while in private practice. 911 F.2d at 1187. The defendants, a bankruptcy judge and a chief district judge, acceded to the appointee's demand that the secretary be terminated. *Id.* We found that the defendants were entitled to qualified immunity. *Id.* at 1190. In doing so, we relied upon highly detailed allegations in the plaintiff's complaint about the contents of her disclosures and the environment in which she worked, as well

as the court's awareness of the institutional dynamics of the bankruptcy court and the district court at the time the events in the case took place. *Id.* at 1185–88. Although *Guercio* shows that it is theoretically possible to recognize qualified immunity on the basis of *Pickering* at the pleading stage, the decision is an outlier. In the typical case, a complaint will not provide the court with enough detail and context to permit a legal conclusion that an employer violated an employee's clearly established rights under *Pickering*.

This case is not an exception to the general rule. Without a more complete record, we cannot fairly weigh Devlin's interest in whistleblowing against the defendants' interest in operating the Board efficiently. Discovery is necessary to develop these facts. Accordingly, we affirm the district court's judgment as to Devlin's First Amendment retaliation claim.

**B.**

Devlin also claims that he did not receive appropriate pre-termination due process as required by *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985). The parties do not dispute that Devlin had a property interest in his civil service position sufficient to support a procedural due process claim. *See Farhat*, 370 F.3d at 595. Prior to an employee's termination from a protected position, his employer must provide "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Loudermill*, 470 U.S. at 546. The employee "does not have a right to, and the Constitution does not require, a neutral and impartial decisionmaker" at this stage. *Farhat*, 370 F.3d at 595. "Where there is a system of post-termination procedures available to the employee that includes a neutral

decisionmaker and/or arbitration, coupled with a pretermination 'right of reply' hearing, then the employee has received all the process due under the Constitution." *Id.* at 596.

Devlin received the minimum level of process to which the Constitution entitled him. After being suspended from work, he received written notice of an investigatory conference. The notice told him he would be asked "questions related to your involvement and conduct in the access and release of confidential information, failure to follow the chain of command, insubordinate behavior, [and] disrespectful conduct." The letter also listed the various department policies he had been accused of violating and invited him to bring counsel to the conference. After the investigatory conference, he received written notice of the disciplinary conference where he was eventually terminated and replied with a letter defending his actions and arguing why termination was inappropriate. Devlin does not dispute that he had an impartial, post-termination proceeding available to him.

Devlin raises two objections to the pre-termination process the defendants afforded him. First, he claims that the charges in the letters he received were not sufficiently specific to put him on notice of the charges he faced. *Loudermill* does not require exacting specificity in the provision of oral or written notice. It only requires sufficient notice "to prevent surprise at the termination and its justification." *Bramley v. Knudson*, 917 F.2d 1304 (table), 1990 WL 169661, at *3 (6th Cir. 1990). The communications Devlin received accomplished this minimal goal. Devlin's argument to the contrary is belied by the lengthy letter he sent to the defendants prior to his disciplinary conference, which demonstrates his understanding of the reasons for his termination. Second, Devlin claims that Davis, who conducted the disciplinary conference, had already made up his mind

before the conference began. This argument would have merit if Davis had been presiding over *post-termination* proceedings, but the decision-maker at a *pre-termination* hearing does not have to be unbiased. *Farhat*, 370 F.3d at 595. Because Devlin's objections to the pre-termination process he received lack merit, the defendants are entitled to qualified immunity on his procedural due process claim.

**V.**

For these reasons, the judgment of the district court is affirmed with respect to Devlin's First Amendment retaliation claim and reversed with respect to his procedural due process claim. We remand the case for further proceedings consistent with this opinion.