GIBBONS, J., delivered the opinion of the court, in which BATCHELDER, C.J., GUY, BOGGS, ROGERS, SUTTON, COOK, McKEAGUE, GRIFFIN, and KETHLEDGE, JJ., joined. CLAY, J. (pp. 570-72), delivered a separate opinion concurring in the judgment only. MOORE, J. (pp. 573-84), delivered a separate dissenting opinion, in which COLE, WHITE, STRANCH, and DONALD, JJ., joined.
OPINION
JULIA SMITH GIBBONS, Circuit Judge.
Clifton Jackson and Christopher Schar-nitzke were employees of Coca-Cola Enterprises, Inc. (“Coca-Cola”) who suffered work-related injuries. They applied for workers’ compensation benefits from Coca-Cola through Sedgwick Claims Management Services (“Sedgwick”), Coca-Cola’s third-party benefit claims administrator. Sedgwick disputed both of their claims and refused to pay benefits. Jackson and Scharnitzke allege that Coca-Cola and Sedgwick “engaged in a fraudulent scheme involving the mail ... to avoid paying benefits to injured employees,” Jackson v. Segwick Claims Mgmt. Servs., 699 F.3d 466, 473 (6th Cir.2012), in violation of the Racketeer Influenced and Corrupt Organizations Act (“RICO”), 18 U.S.C. § 1962(c). Accordingly, they sued Coca-Cola, Sedgwick, and Dr. Paul Drouil-lard — a so-called “cut-off’ doctor who allegedly colluded with Coca-Cola and Sedg-wick to discontinue Jackson’s benefits — in federal district court pursuant to RICO’s civil-remedy provision. See 18 U.S.C. § 1964(c).[1]
The district court granted the defendants’ motions to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). A panel of this court reversed in reliance on Brown v. Cassens Transport Co., 675 F.3d 946 (6th Cir.2012) (Brown II), which rejected many of the legal arguments the district court relied upon in granting the motion to dismiss. As was true in Brown II, the panel was divided over the proper resolution of the appeal. See Jackson, 699 F.3d at 485-87 (Batchelder, C.J., concurring in the judgment); Brown II, 675 F.3d at 969-74 (Gibbons, J., dissenting). The court granted the defendants’ petition to rehear this case en banc. Because the plaintiffs have not pled an injury to their “business or property” that is compensable under § 1964(c), *559 we overrule Brown II and affirm the district court’s judgment.
I.
We begin by providing some background about Michigan’s workers’ compensation system. “When Michigan adopted the [Workers’ Disability Compensation Act (“WDCA”) ], it essentially created a ‘no-fault’ system under which a worker no longer has to establish negligence on the part of the employer but the employer is liable for certain expenses related to an injury suffered on the job without regard to fault.” Brown v. Cassens Transp. Co., 743 F.Supp.2d 651, 661-62 (E.D.Mich.2010) (Brown I), rev’d, 675 F.3d 946 (6th Cir.2012). This design ensures recovery for injured employees while creating greater certainty for employers. Hesse v. Ashland Oil, Inc., 466 Mich. 21, 642 N.W.2d 330, 334 (2002). The system achieves this goal, in part, because “[t]he right to the recovery of benefits [under the WDCA is] the employee’s exclusive remedy against the employer for a personal injury or occupational disease. The only exception to this exclusive remedy is an intentional tort.” Mich. Comp. Laws § 418.131. If this were not the case, injured employees could circumvent the restrictions the WDCA places on the benefits an injured employee is entitled to receive. See id. §§ 418.301 (wage loss benefits), 418.315 (medical expenses), 418.319 (rehabilitation services).
In exchange for the employer’s promise to pay certain types of benefits and the employee’s promise to forsake other remedies, the workers’ compensation system ensures efficient benefit payments and dispute resolution. “An employee, who receives a personal injury arising out of and in the course of employment by an employer who is subject to this act at the time of the injury, shall be paid” workers compensation benefits according to the statutory scheme once he provides notice of a work-related injury to an employer. Id. § 418.301(1) (emphasis added). Benefits to an injured employee “become due and payable on the fourteenth day after the employer has notice or knowledge of the disability.” Id. § 418.801(1). Failure to pay benefits when owed can lead to the imposition of fines on the employer. Id. § 418.801(2).
If an employer believes an employee is not entitled to benefits, it may dispute the claim. An employer is not obligated to pay benefits or fines when there is an “ongoing dispute” over an employee’s claim, regardless of the merits of the dispute. Id.; see also Warner v. Collavino Bros., 133 Mich.App. 230, 347 N.W.2d 787, 790 (1984) (“On its face [the statute] merely requires an ‘ongoing dispute’ and does not distinguish good faith disputes from bad faith or unreasonable disputes.”). If the employee is later found to be entitled to benefits, the employer is liable for statutory interest for the period during which it withheld benefits. Mich. Comp. Laws § 418.801(6) (“When weekly compensation is paid pursuant to an award of a worker’s compensation magistrate, an arbitrator, the board, the appellate commission, or a court, interest on the compensation shall be paid.... ”); McCaslin v. GM Corp., 133 Mich.App. 782, 349 N.W.2d 544, 546 (1984) (observing that interest “is imposed because the employer benefits from the use of the money determined to be due to the employee and because the employee had to do without its use”).
Because the workers’ compensation system is typically the only remedy available to employees who suffer a work-related injury in Michigan, the state has created a comprehensive administrative system for resolving disputes between employers and employees over benefits:
*560 A disputed claim for benefits is first reviewed by a mediator, or at a hearing before a workers compensation magistrate [from the Worker’s Compensation Agency Board of Magistrates]. Mich. Comp. Laws § 418.847. The statute provides that the parties may seek review of the magistrate’s decision by the Workers Compensation Appellate Commission [ (“WCAC”) ]. Mich. Comp. Laws § 418.859(a). Finally, the decision of the WCAC is subject to judicial review [in the Michigan Court of Appeals and Michigan Supreme Court]. Mich. Comp. Laws § 418.861(a)....
The WDCA contains its own procedures for policing abuses of the obligations imposed to timely pay benefits. First, under Mich. Comp. Laws § 418.631(2), a self-insurer ... can lose its privilege to self-insure if it “repeatedly or unreasonably fails to pay promptly claims for compensation for which it shall become liable.” Also, under section 418.861b, the WCAC may dismiss a claim submitted for review, and assess costs and take other disciplinary action if it determines that the claim is proceeding vexatiously or was taken without a reasonable basis for believing that the claim had merit. Further, “[t]he bureau may appoint a duly qualified impartial physician to examine the injured employee and to report.” Mich. Comp. Laws § 418.865.
Brown I, 748 F.Supp.2d at 662-63.
We add a few observations to the general outline of the dispute resolution system that the district court provided in Brown I. First, employers and employees both have the ability to introduce evidence and develop a record at the initial hearing before the workers’ compensation magistrate. During the hearing, the employee has the burden of proving an “entitlement to compensation and benefits ... by a preponderance of the evidence.” Mich. Comp. Laws § 418.851. The magistrate is authorized to “administer oaths, subpoena witnesses, and examine such parts of the books and records of the parties to a proceeding as relate to questions in dispute.” Id. § 418.853; see also Mich. Admin. Code § 418.55 (explaining procedures for admitting and contesting evidence at a hearing); Stokes v. Chrysler LLC, 481 Mich. 266, 750 N.W.2d 129, 139-40 (2008) (noting that “the employer has a right to discovery ... [if] necessary for the employer to sustain its burden and present a meaningful defense,” such as an interview with the claimant by a retained vocational expert); Boggetta v. Burroughs Corp., 368 Mich. 600, 118 N.W.2d 980, 981 (1962) (holding that an employer can be required to answer interrogatories necessary for the employee to “inquire into the facts which might or might not establish her rights to compensation”). This fact-finding authority extends to credibility determinations. Alexander v. Covel Mfg. Co., 336 Mich. 140, 57 N.W.2d 324, 326 (1953) (“The credit to be given the testimony of the witnesses, and especially medical testimony when there is a conflict, is solely for the commission’s determination.” (emphasis added)).
Second, the review process provides numerous opportunities for the applicant to demonstrate that an employer denied his claim through fraud. We have already noted an employee’s ability to introduce evidence supporting his claim and refuting contrary evidence advanced by the employer. After the magistrate issues an order awarding or denying benefits, the employee and employer may appeal to the WCAC, which considers whether the magistrate’s initial decision was “supported by competent, material, and substantial evidence on the whole record,” Mich. Comp. Laws § 418.861a(3), “including] both a qualitative and quantitative analysis of that evidence in order to ensure a full, *561 thorough, and fair review,” id. § 418.861a(13). While the Michigan Court of Appeals and Michigan Supreme Court have a more limited ability to review the facts underlying a disability determination, they may nonetheless review factual findings for fraud. Id. § 418.861a(14) (“The findings of fact made by the commission acting within its powers, in the absence of fraud, shall be conclusive.” (emphasis added)). Even when the parties agree to settle a claim via a redemption of the employer’s outstanding liability for benefits, id. § 418.835(1), the redemption must be approved by a magistrate who assesses whether the settlement is “just and proper under the circumstances, and is in the best interests of the injured employee,” id. § 418.836(l)(a). See also Solo v. Chrysler Corp., 406 Mich. 240, 277 N.W.2d 629, 629-30 (1979) (recognizing that an employee can bring an action to set aside a redemption if she discovers that the employer procured the redemption by fraud). The process for disputing benefits therefore contains multiple tiers of review that are designed to prevent benefits decisions from being tainted by fraud.
II.
With this background in mind, we now turn to the plaintiffs’ allegations. The panel opinion provides a detailed overview of the operative complaint, which we summarize briefly below. See Jackson, 699 F.3d at 473-75. Because this case arises from the grant of a motion to dismiss, the court must accept the complaint’s well-pled facts as true. Erie Cnty. v. Morton Salt, Inc., 702 F.3d 860, 867 (6th Cir.2012).
A.
Jackson injured his back while working for Coca-Cola in 2007 and began receiving workers’ compensation benefits. Both his treating physician and another physician who examined Jackson twice in 2008 at Sedgwick’s request found that Jackson was disabled due to a work-related back injury. Despite these reports, Sedgwick asked Jackson on January 6, 2009 to submit to another “independent” examination by Drouillard. The plaintiffs assert that Drouillard was a “cut-off’ doctor — that is, a doctor “who could be relied upon to lie for defendants and write a report stating a claimant did not have a work related disability regardless of the true facts” — whom Sedgwick retained to examine patients in an effort to deny compensation to deserving claimants. After examining Jackson, Drouillard prepared a medical report for Sedgwick dated January 14, 2009, in which he claimed Jackson was not disabled. Jackson alleges that the report’s conclusion rests on numerous false assertions. Sedgwick stopped Jackson’s benefits in reliance on the report.
Jackson filed a petition for benefits with the Board of Magistrates. Jackson, 699 F.3d at 474. After the district court entered its order dismissing his complaint in this case, but before the workers’ compensation magistrate ruled on the dispute between Jackson and Sedgwick, Jackson settled his claim with Sedgwick. Id.
B.
Scharnitzke was a delivery driver for Coca-Cola. He began experiencing pain in his left shoulder in 2004 that he claims was related to his work. Between July 2007 and February 2008, he took a leave of absence from work that he claims was injury-related, although he did not seek workers’ compensation while he was away. An orthopedic surgeon Scharnitzke visited in August 2007 diagnosed this work-related pain as “acromioclavicular arthritis.” On March 4, 2008, Scharnitzke injured his left shoulder while lifting products up a flight of stairs. Coca-Cola’s company clin *562 ic determined that Seharnitzke had a “minor work aggravation” that qualified him for workers’ compensation and sent its records to Sedgwick. Instead of paying benefits, Sedgwick disputed Scharnitzke’s claim in a notice sent to the Board of Magistrates on March 18, 2008. Sedgwick claimed Scharnitzke’s “acromioclavicular arthritis” was not work-related and maintained this position after Seharnitzke sent information from his orthopedic surgeon which supported his position that his disability was work-related. Seharnitzke alleges that Sedgwick had no genuine factual basis for this position and only took it in a bad-faith effort to deny him benefits.
On May 13, 2010, a workers’ compensation magistrate awarded Seharnitzke benefits from March 5, 2008 through July 6, 2009, but rejected his application for benefits related to the time he took off between July 2007 and February 2008. Scharnitzke v. Coca-Cola Enters., Inc. (May 13, 2010), available at http://www.dleg.state. mi.us/WCA/PDFS/Opinions_051409/2010/ scharnitzke.christopher.5.13.10.pdf. Scharnitzke and Coca-Cola both appealed to the WCAC. The WCAC affirmed the Board in part by only awarding Seharnitzke benefits through January 5, 2009. Scharnitzke v. Coca-Cola Enters., Inc., No. 10-0061 (May 11, 2011), available at http://www.dleg. state.mi.us/ham/wcac/llpdfa/07400061.pdf. It also dismissed Scharnitzke’s appeal of the denial of benefits for the earlier time period. Id. Seharnitzke appealed the WCAC’s ruling to the Michigan Court of Appeals, which affirmed the modification of the award and reversed the WCAC’s dismissal of Scharnitzke’s appeal. Scharnitzke v. Coca-Cola Enters., No. 304515, 2012 WL 5193200 (Mich.Ct.App. Oct. 18, 2012). Both parties appealed to the Michigan Supreme Court. The Supreme Court reinstated the WCAC’s dismissal of Schar-nitzke’s appeal and otherwise declined review of the case on March 27, 2013. Scharnitzke v. Coca-Cola Enters., 493 Mich. 947, 828 N.W.2d 19 (2013).
III.
This court reviews the district court’s order granting the defendants’ motion to dismiss de novo. Ohio Police & Fire Pension Fund v. Standard & Poor’s Fin. Servs. LLC, 700 F.3d 829, 835 (6th Cir.2012). We must “construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff.” Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir.2007). The plaintiffs must “plead[] factual content that allows the court to draw the reasonable inference that the defendant^ are] liable for the misconduct alleged.” Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). If the plaintiffs do “not nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed.” Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).
IV.
The district court and the defendants put forward “several grounds on which the plaintiffs’ case could be dismissed, and in order to affirm the decision of the district court,” we only need to recognize one of them. Brown II, 675 F.3d at 969 (Gibbons, J., dissenting). For the reasons below, the plaintiffs have failed to allege that they were “injured in [their] business or property,” as is required to state a claim for a civil RICO damages action.[2] 18 U.S.C. § 1964(c). As a result, *563 we decline to reach the defendants’ other arguments in support of the district court’s judgment.
A.
Concerns about the scope of RICO are not new. Courts have long recognized that RICO has evolved “into something quite different from the original conception of its enactors,” who sought to “supplement old remedies and develop new methods for fighting crime.” Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 498, 500, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Nonetheless, the unexpected scope of RICO can largely be attributed to the terms of the statute itself. Congress chose “self-consciously expansive language” when it adopted RICO, id. at 498, 105 S.Ct. 3275, defined the “predicate acts” necessary to establish a pattern of racketeering activity broadly, id. at 497, 499, 105 S.Ct. 3275, and directed courts to give the statute a liberal construction, Organized Crime Control Act of 1970, Pub.L. 91-452, § 904(a), 84 Stat. 922, 947. As a consequence, courts have frequently rejected arguments that RICO should be given constructions that prevent it from reaching conduct that Congress may not have intended it to reach. “[T]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.” Sedima, 473 U.S. at 499, 105 S.Ct. 3275 (internal quotation marks omitted) (quoting Haroco, Inc. v. Am. Nat’l Bank & Trust Co. of Chi., 747 F.2d 384, 398 (7th Cir.1984)).
Nonetheless, RICO’s breadth is not boundless. The text of the statute imposes genuine limitations. With respect to § 1964(c), these limits have often been derived from the similarities between RICO and the antitrust laws. The Supreme Court has “repeatedly observed that Congress modeled § 1964(c) on the civil-action provision of the federal antitrust laws.” Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 267, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (internal citations omitted). Courts have therefore looked to § 4 of the Clayton Act;[3] its predecessor, § 7 of the Sherman Act; and cases construing these statutes in order to identify limits to the civil remedy afforded by § 1964(c). For example, in Holmes, the Supreme Court relied on cases interpreting § 4 and § 7 to conclude that the phrase “by reason of’ in § 1964(c) imposed a proximate cause requirement. Holmes, 503 U.S. at 265-68, 112 S.Ct. 1311. Having “used the same words” to describe the civil remedy in antitrust and RICO, “we can only assume [Congress] intended them to have the same meaning that courts had already given them.” Id. at 268, 112 S.Ct. 1311.
Another limitation in § 1964(c) that has its origins in the antitrust laws is the requirement that a plaintiff be “injured in *564 his business or property” in order to bring a civil action. While the Supreme Court has yet to definitively interpret this phrase as it appears in § 1964(c), it has construed it in the context of the antitrust laws. In Reiter v. Sonotone Corp., 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), the Court held that “consumers who pay a higher price for goods purchased for personal use as a result of antitrust violations sustain an injury in their ‘business or property’ ” under § 4. 442 U.S. at 334, 99 S.Ct. 2326. In so doing, it rejected the respondents’ argument that “the phrase ‘business or property’ means ‘business activity or property related to one’s business.’” 442 U.S. at 338, 99 S.Ct. 2326. While conceding the breadth of its ruling that “monetary injury, standing alone, may be injury in one’s ‘property,’” the Court pointed out that “[t]he phrase ‘business or property’ also retains restrictive significance. It would, for example, exclude personal injuries suffered. Congress must have intended to exclude some class of injuries by the phrase ‘business or property.’ ” Id. at 339-40, 99 S.Ct. 2326 (internal citation omitted). This comment echoed historic concerns about the relationship between federal antitrust laws and the state tort system:
[The Sherman Act] does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce. “The maintenance in our federal system of a proper distribution between state and national governments of police authority and of remedies private and public for public wrongs is of far-reaching importance. An intention to disturb that balance is not lightly to be imputed to Congress.”
Hunt v. Crumboch, 325 U.S. 821, 826, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945) (quoting Apex Hosiery Co. v. Leader; 310 U.S. 469, 513, 60 S.Ct. 982, 84 L.Ed. 1311 (1940)).
Reiter postdates RICO by nine years, and unlike the phrase “by reason of,” which had a well-established meaning in the context of antitrust when Congress enacted RICO, we cannot assume that Congress agreed with Reiter’s interpretation of the phrase “business or property” when it modeled § 1964(c) on § 4. Nonetheless, Reiter’s common-sense observation about § 4 applies with equal logical force to § 1964(c). “Congress must have intended to exclude some class of injuries by the phrase ‘business or property’ ” when it enacted RICO. Reiter, 442 U.S. at 339, 99 S.Ct. 2326. A personal injury— that is, an injury “to a person, such as a broken bone, a cut, or a bruise” or a “bodily injury” — is different in kind from an injury to “business or property,” in the sense that those terms are commonly understood. Black’s Law Dictionary 857 (9th ed.2009). This interpretation accords with our standard practice of “giv[ing] effect to all the words [in a statute] to avoid an interpretation which would render words superfluous or redundant.” Walker v. Bain, 257 F.3d 660, 667 (6th Cir.2001).
In reliance on Reiter, those regional circuits that have construed the phrase “business or property” have uniformly recognized that “the ordinary meaning of the phrase ‘injured in his business or property’ excludes personal injuries, including the pecuniary losses therefrom.” Grogan v. Platt, 835 F.2d 844, 847 (11th Cir.1988) (denying civil RICO standing to FBI agents injured in a gun fight with members of a criminal enterprise).[4] This court *565 has done likewise. See, e.g., Fleischhauer v. Feltner, 879 F.2d 1290, 1300 (6th Cir.1989). Thus, “a person physically injured in a fire whose origin was arson is not given a right to recover for his personal injuries [under § 1964(c) ]; damage to his business or his building is the type of injury for which § 1964(c) permits suit.” Bankers Trust Co. v. Rhoades, 741 F.2d 511, 515 (2d Cir.1984), vacated on other grounds, 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985).
B.
At the outset, it is necessary to examine what law determines whether an injury constitutes a personal injury or an injury to business or property under civil RICO. Brown II, 675 F.3d at 970 (Gibbons, J., dissenting). Although “some role does exist for state law,” the question of “where to set the ‘business or property’ threshold depends on federal statutory purpose, and that purpose is likely to support a definition that is uniform throughout the country.” DeMauro v. DeMauro, 115 F.3d 94, 96-97 (1st Cir.1997). Therefore, the task of this court is “to determine whether Congress intended the damages that plaintiffs seek in this case to be recoverable under civil RICO.” Grogan, 835 F.2d at 846.
The majority in Brown II recognized that personal injuries and “[a]ny pecuniary losses proximately resulting from a personal injury caused by a RICO violation, e.g. attorney fees, lost wages, and medical expenses, are ... not recoverable.” Brown II, 675 F.3d at 959. These losses are not recoverable because of the origin of the underlying injury. In order to explain the restrictive significance of the phrase “business or property,” the Reiter Court distinguished a non-redressable “personal injury” from “a consumer’s monetary injury arising directly out of a retail purchase ” tainted by anticompetitive behavior. Reiter, 442 U.S. at 339, 99 S.Ct. 2326 (emphasis added). Courts interpreting RICO have remained faithful to this distinction by excluding damages “arising directly out of’ a personal injury, even though personal injuries often lead to monetary damages that would be sufficient to establish standing if the plaintiff alleged a non-personal injury. The reason why these expenses do not constitute an injury to property is because a personal injury does not lead to “a proprietary type of damage.” Rhoades, 741 F.2d at 515. Although courts have used various terms to describe the distinction between non-redressable personal injury and redressable injury to property, the concept is clear: both personal injuries and pecuniary losses flowing from those personal injuries fail to *566 confer relief under § 1964(c). Brown II, 675 F.3d at 969-70 (Gibbons, J., dissenting) (citing Evans v. City of Chicago, 434 F.3d 916, 926 (7th Cir.2006), overruled on other grounds by Hill v. Tangherlini, 724 F.3d 965, 968 n. 1 (7th Cir.2013)).
The Brown II majority attempted to place this case outside of the personal injury exception by arguing that workers’ compensation benefits, which are an “intervening legal entitlement” that arises after a personal injury, and that these benefits differ from “pecuniary losses” that flow from a personal injury. Brown II, 675 F.3d at 959-61. Under this theory, “[w]hen a plaintiffs personal injury is filtered through the WDCA, it is converted into a property right.” Id. at 965. The panel relied upon dicta in Evans which recognized that a plaintiff might be able to establish a RICO claim if he could “establish that he has been unlawfully deprived of a property right in promised or contracted for wages.” Evans, 434 F.3d at 928. It noted that Evans did not preclude the possibility of such a claim if the promise of benefits arose after the employee suffered a personal injury. Brown II, 675 F.3d at 961. The panel concluded that because the defendants’ racketeering acts had devalued this “legal entitlement,” instead of causing the plaintiffs’ personal injuries, it did “not make sense” to hold that the alleged damage “flowed” from the initial personal injury. Id.
The Brown II majority’s characterization of the plaintiffs’ claims as alleging injury to a promise of benefits or wages made after a personal injury is unpersuasive. The Michigan workers’ compensation system reflects a complex set of bargains between employers and employees. It provides a framework in which the employee may obtain compensation for a “personal injury” — that is, lost wages, rehabilitation services, and medical expenses. It also allows an employer to dispute an employee’s entitlement to benefits, just as the employer would be able to defend itself in a personal injury action. Even if one assumes that an employee has a “legal entitlement” to such benefits, those benefits merely reflect the pecuniary losses associated with the personal injury. By holding that the plaintiffs’ asserted damages do not flow from a personal injury, the Brown II majority ignored the underlying reality that an award of benefits under a workers’ compensation system and any dispute over those benefits are inextricably intertwined with a personal injury giving rise to the benefits.
In this case, the plaintiffs claim that they were legally entitled to receive certain benefits mandated by statute as a consequence of their personal injuries, and that they received less than they were entitled to under that system because of the defendants’ racketeering conduct. But the losses they allege are simply a shortcoming in the compensation they believed they were entitled to receive for a personal injury. They are not different from the losses the plaintiffs would experience if they had to bring a civil action to redress their personal injuries and did not obtain the compensation from that action they expected to receive. Michigan’s decision to create a workers’ compensation system does not transform a disappointing outcome in personal injury litigation into damages that can support a RICO civil action, even if Michigan law characterizes the benefits awarded under this system as a legal entitlement. Accordingly, racketeering activity leading to a loss or diminution of benefits the plaintiff expects to receive under a workers’ compensation scheme does not constitute an injury to “business or property” under RICO.
C.
Our interpretation of the statute is confirmed by the principle that Congress typi- *567 eally does not upset the established distribution of power between federal and state governments without a clear statement of its intent to do so. Concerns about federalism are particularly acute in this case, where the plaintiffs are using RICO to collaterally attack an administrative scheme created by state law to supplant personal injury tort claims. If Congress intended to recalibrate state and federal power in an area that has traditionally been the province of state government by placing federal courts in the position of reviewing a state agency’s handling of charges of impropriety by parties appearing in front of it, we would expect a clear statement of Congress’s intent to achieve such a result.
The leading authority on this dear-statement principle is Gregory v. Ashcroft, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). The plaintiffs in Gregory brought an Age Discrimination in Employment Act (“ADEA”) challenge to a provision in the Missouri constitution that required municipal judges to retire at the age of seventy. 501 U.S. at 455, 111 S.Ct. 2395. The Court held that judges were not covered by the ADEA’s definition of the term “employee,” which contains exclusions from its coverage that are ambiguous as to whether judges are protected by the ADEA. Id. at 464-67, 111 S.Ct. 2395. It acknowledged that Congress “holds a decided advantage” within the Constitution’s federalist structure by virtue of the Supremacy Clause, and that it “may legislate in areas traditionally regulated by the States.” Id. at 460, 111 S.Ct. 2395. Nonetheless, this power is an “extraordinary” one that “Congress does not exercise lightly.” Id. Moreover, the claims in Gregory raised particularly serious federalism concerns because the appointment of judges is “a decision of the most fundamental sort for a sovereign entity.” Id. Accordingly, the Court applied a “plain statement rule” when interpreting the ADEA in order to avoid a potential conflict between the statute and the Constitution. Id. at 460-61, 111 S.Ct. 2395.
The Gregory Court relied on prior decisions invoking this interpretive canon in a variety of contexts to justify relying upon it when interpreting the ADEA.[5] To these decisions, we can add the Hunt and Apex Hosiery cases. As mentioned earlier, one of the historic concerns of courts construing the private right of action under the antitrust laws was to achieve “a proper distribution between state and national governments of police authority and of remedies private and public for public wrongs.” Apex Hosiery Co., 310 U.S. at 513, 60 S.Ct. 982. Because “[t]he clearest current in [RICO’s] history is the reliance on the Clayton Act model,” Sedima, 473 U.S. at 489, 105 S.Ct. 3275, we should be *568 cognizant of federalism concerns when construing RICO, as well.
Before explaining how this rule influences our decision in this case, we must be careful to limit the rule’s implications. We do not hold today that Congress is barred from enacting remedies that supplement or supplant Michigan’s workers’ compensation regime. The federal government is supreme under the Constitution within its sphere. Congress’s powers under the Commerce Clause “can be expansive,” Nat’l Fed. of Indep. Bus. v. Sebelius, — U.S. -, 132 S.Ct. 2566, 2578, 183 L.Ed.2d 450 (2012), and as a consequence, a panoply of federal laws now govern the relationship between employer and employee. Although Michigan has the right to declare that its workers’ compensation system is the exclusive remedy under state law for workplace injuries, see Mich. Comp. Laws § 418.131, it cannot exclude the federal government from providing its own remedies so long as it acts within the scope of its enumerated powers. See Brown II, 675 F.3d at 953-54 (collecting cases).
But to say that Congress has the power to create a particular remedy does not mean that it has actually exercised that power in a particular statute. Workers’ compensation schemes like the one at issue in this case are designed to supplant a body of law that has always been within the domain of the states’ police powers. The RICO theory advanced by the plaintiffs in this case throws the viability of these schemes into doubt by allowing any employee who believes an employer denied his workers’ compensation claim through fraud to recast this dispute as a RICO claim. Moreover, there is nothing preventing an employer from turning this theory on its ear and accusing employees of a pattern of mail or wire fraud designed to support benefits claims. Jackson, 699 F.3d at 486 (Batchelder, C.J., concurring in the judgment). Although RICO is a remedial statute and it is designed to have a broad sweep, it “does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.” Hunt, 325 U.S. at 826, 65 S.Ct. 1545. The plaintiffs’ reading of RICO would dramatically alter the “proper distribution between state and national governments of police authority and of remedies private and public for public wrongs” by making federal courts an alternative forum for workers’ compensation disputes. Apex Hosiery, 310 U.S. at 513, 60 S.Ct. 982.
The mechanism by which this redistribution of power is brought about is equally troubling. If an employee believes that an employer has taken a meritless position about his entitlement to benefits or procured fraudulent evidence in order to support such a position, the workers’ compensation scheme Michigan has established provides ample mechanisms by which the employee can contest these actions. But the plaintiffs’ broad conception of injury to “business or property” creates a form of federal collateral review of the benefits process, backed up by the threat of treble damages. This is akin to giving every state court litigant a federal cause of action whenever an adversary engages in conduct that, if done in federal court, would violate Federal Rule of Civil Procedure 11. Congress might have the authority to enact such a law, but we are certain that if it intended to do so, it would have provided more explicit guidance.
To summarize, we would expect Congress to give a clear statement of its intent to intervene in Michigan’s administrative system for handling workers’ compensation claims. While we recognize that RICO is a remedial statute that deserves a liberal construction, it is not a means for *569 federalizing personal injury tort claims arising under state law. RICO lacks a clear statement of Congress’s intent to effectuate such a change in the law. The absence of such a clear statement confirms our conclusion that the interpretation of § 1964(c) we adopt today is the proper one.
D.
Before concluding, we revisit the arguments the majority in Brown II made for rejecting the interpretation of § 1964(c) we adopt today.[6]
First, the majority in Brown II claimed that “a plain reading of the text of RICO provides no support for excluding certain categories of property interests based on how the interest itself originated” and does not “reject recovery for certain legal entitlements because they accrued following a personal injury wholly unrelated to the RICO offense at issue.” Brown II, 675 F.3d at 960. We think it is plain that the statute does exactly this, as the Supreme Court recognized in Reiter, by limiting recovery to damages arising from an injury to “business or property” and, by implication, excluding recovery for damages arising from a personal injury. Plaintiffs must allege a “proprietary type of damage” to establish a RICO claim, Rhoades, 741 F.2d at 515, and the plaintiffs in this case have only alleged that they received less from their personal injury claim than they believed they were entitled to receive. Moreover, we cannot agree that the alleged RICO offense and the personal injury are “wholly unrelated.” Michigan’s workers’ compensation system is a comprehensive system for the resolution of personal injury claims arising from the workplace, and disputes over those benefits cannot fairly be separated from the injury creating the entitlement to those benefits.
Second, the majority in Brown II contended that this interpretation of § 1964(c) .“ignores the Supreme Court’s instruction to interpret RICO broadly.” Brown II, 675 F.3d at 960. But this “liberal construction” requirement, which dates back to RICO’s enactment, does not exist in a vacuum. The most liberal construction of RICO’s language is not always the proper ■ one. For example, it is not evident that the terms “by reason of’ in § 1964(c) import a “proximate cause” requirement into RICO civil actions, and there are more liberal ways of interpreting that phrase than the one the Supreme Court chose in Holmes. Nonetheless, the Holmes Court found that tools of statutory construction other than Congress’s mandate to give RICO a liberal construction were necessary to determine the scope of the limitations Congress did put in the statute. We have attempted to do the same in this case.
Third, the Brown II majority believed that focusing on the origin of the property “would yield inconsistent results” by depriving similarly situated plaintiffs of RICO causes of action based on the nature of their injury. Id. at 960-61. For instance, even though the plaintiffs have no cause of action under the theory we advance today, a welfare recipient could hypothetically file a RICO action based on fraudulent devaluation of welfare benefits, because that injury is not a “personal injury.” Id. Assuming this is true, the inconsistency is not a sign of bad statutory construction, but “the natural result of the [congressional definition of injuries within the statute’s reach.” Id. at 970 n. 2 (Gib *570 bons, J., dissenting). Long before this case, courts recognized that the “business or property” limitation in § 1964(c) created a distinction between compensable and non-compensable injuries that some might consider arbitrary. Rhoades, 741 F.2d at 515 (recognizing that damages to a building caused by arson would be compensable under RICO, but personal injuries sustained during an arson would not). The question here is not whether Congress drew such a line when it imported the “business or property” limitation from antitrust to RICO — every court that has examined this issue agrees that it did — but where that line is. Line-drawing of this sort inevitably creates results that could be deemed inconsistent, but the existence of such inconsistencies does not demonstrate that the statute has been misconstrued.
V.
For these reasons, we affirm the judgment of the district court.

. "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney’s fee....” 18 U.S.C. § 1964(c).

. This can also be characterized as a statutory standing issue. Brown II, 675 F.3d at 969 *563 (Gibbons, J., dissenting) (“[W]ithout an allegation of damages to business or property by reason of a violation of § 1962, plaintiffs will not have standing to pursue their RICO claims.”). The question of statutory standing is "analytically distinct from the question whether a federal court has subject-matter jurisdiction to decide the merits of a case.” Roberts v. Hamer, 655 F.3d 578, 580 (6th Cir.2011). "Where a plaintiff lacks statutory standing to sue, her claim should be dismissed for failure to state a claim upon which relief can be granted....” Id. at 581.

. "[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.” 15 U.S.C. § 15(a).

. See also Evans v. City of Chicago, 434 F.3d 916, 924-26 (7th Cir.2006) (holding that damages allegedly caused by false imprisonment and wrongful prosecution fell within the "personal injury” exception); Diaz v. Gates, 420 F.3d 897, 900 (9th Cir.2005) (en banc) (rejecting claim that "every loss of wages resulting from a personal injury” creates RICO *565 liability); Hughes v. Tobacco Inst., Inc., 278 F.3d 417, 422 (5th Cir.2001) (precluding civil RICO claims based on “personal injury or death” from cigarette smoking); Hamm v. Rhone-Poulenc Rorer Pharm., Inc., 187 F.3d 941, 954 (8th Cir.1999) (concluding damage to reputation is a non-compensable "personal injury” under RICO); Bast v. Cohen, Dunn & Sinclair, PC, 59 F.3d 492, 495 (4th Cir.1995) ("An allegation of personal injury and pecuniary losses occurring therefrom are not sufficient to meet the statutory requirement of injury to 'business or property.' ”); Doe v. Roe, 958 F.2d 763, 767-70 (7th Cir.1992) (rejecting RICO claim for failure to allege a proper injury because the plaintiff’s asserted economic losses were "plainly derivatives of ... emotional distress” caused by her divorce lawyer coercing her into a sexual relationship "and therefore reflect personal injuries which are not compensable under RICO”); Drake v. B.F. Goodrich Co., 782 F.2d 638, 644 (6th Cir.1986) (denying RICO standing to plaintiffs claiming they were injured by exposure to toxic chemicals during their employment with the defendant). But see Diaz, 420 F.3d at 903-07 (Kleinfeld, J., concurring) (concluding that "[a] careful reading of [§ 1964(c)] cannot be reconciled with the 'personal injury' exclusion in the [Doe] and [Grogan] cases.”).

. See Will v. Mich. Dep’t of State Police, 491 U.S. 58, 64-65, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) (concluding 42 U.S.C. § 1983 does not speak in sufficiently clear terms to abrogate a state’s sovereign immunity); Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 246, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985) (applying a clear statement rule to conclude that "the Rehabilitation Act does not abrogate the Eleventh Amendment bar to suits against the States”); United States v. Bass, 404 U.S. 336, 349, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) ("[W]e will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction. In [such] areas ... the requirement of clear statement assures that the legislature has in fact faced ... the critical matters involved in the judicial decision.”); Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947) ("[W]e start with the assumption that the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress” when analyzing preemption questions).

. The dissent would reject our interpretation of § 1964(c) for the same reasons. Dissent at 581-84.