NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 15a0433n.06

Case No. 13-1410

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jun 11, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| WILLIE EARL GOLDSMITH, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| UNKNOWN SHARRETT, et al., | ) | MICHIGAN |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |

BEFORE: MERRITT and WHITE, Circuit Judges and HOOD, District Judge.[*]

**HOOD**, **District Judge**. Goldsmith appeals the district court's dismissal of his civil rights complaint as barred by the statute of limitations. Goldsmith argues that the defendants' conduct constitutes a continuing violation of his constitutional rights and, thus, the statute of limitations is tolled until the violation is remedied. For the reasons that follow, we **AFFIRM**.

**I.**

Willie Earl Goldsmith is a prisoner within the Michigan Department of Corrections and a self-proclaimed author of urban fiction and children's stories. Goldsmith complains of a series of events involving repeated seizures of his manuscripts by prison staff. The first incident

---

[*] The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

occurred in September 2007, when he complained to Defendant Sharrett's supervisor regarding cell lights. Goldsmith claims that, shortly thereafter, Sharrett retaliated by searching his cell and seizing a fictional manuscript Goldsmith had authored titled "Green Tag So Hot It Sizzles," which featured sexually explicit content involving a prisoner and a female prison guard. Based on the content of the writing, Sharrett issued a sexual-misconduct report. Sharrett seized three other manuscripts from Goldsmith's cell, deeming them contraband, as well. On September 27, 2007, Defendant Maki, a Hearing Officer with the State Office of Administrative Hearings, conducted a major-misconduct hearing. Maki determined that the "Green Tag" document was written to harass and degrade female staff and upheld the charge with respect to that writing. Maki ordered that the three other documents be returned to Goldsmith, however, because the misconduct report did not make reference to those writings. Sharrett subsequently filed a Notice of Intent for a hearing regarding the same three documents. On September 29 and October 9, Sharrett searched Goldsmith's cell and seized other sexually explicit writings. On October 15, 2007, Maki conducted a major-misconduct hearing in which she found in favor of Goldsmith, concluding that if charges were to be brought based on the writings, they should have been included in the first misconduct report.

Sharrett issued another misconduct report against Goldsmith on October 9, 2007, when Goldsmith threatened to carry out violent sexual acts against female prison staff. That same day, Sharrett wrote an additional misconduct report against Goldsmith for dangerous contraband involving manipulation to his eyeglasses. Maki conducted a hearing and upheld both charges.

On October 15, 2007, Defendant Carberry held an administrative hearing concerning a notice of mail rejection. Goldsmith had requested to send to his nephew the three manuscripts that were confiscated along with "Green Tag," but Carberry determined that the mail should be

destroyed because the "paper work describe[d] criminal behavior." Further, Carberry opined, the "[p]risoner being allowed to continue this writing will interfere with his rehabilitation."

On October 22, 2007, Sharrett seized twenty-one fiction manuscripts, a children's book, and a five-hundred-page novel, which were all handwritten by Goldsmith. Goldsmith contends that Sharrett also seized two dictionaries. Sharrett wrote a Notice of Intent, which stated that the manuscripts "contained sexual acts by prison staff and prisoners," as well as "stories of violence, murder and drug dealing." Carberry conducted an administrative hearing on October 29, 2007, at which she determined that the items should be destroyed because they described criminal activity and, therefore, interfered with the security, good order, and discipline of the facility. It is not known whether the children's book and the dictionary were returned to Goldsmith.

On November 26, 2007, Goldsmith attempted to send some of his manuscripts to an attorney. Carberry inspected the mail in Goldsmith's presence and, upon determining that it was "a story" and was not "legal mail," refused to mail it.

In early February 2008, Defendant Exelby searched Goldsmith's cell and confiscated an unfinished manuscript based on content Exelby characterized as "rape and sexual assault." Goldsmith contends that the content actually described "a kiss on the cheek." In April 2008, Carberry conducted a hearing and denied Goldsmith's request that the manuscript be mailed to Goldsmith's nephew and instead ordered that the manuscript be destroyed.

Also in February, Goldsmith attempted to send mail to his nephew, which was rejected and resulted in a major-misconduct report. The report stated that Goldsmith's letter to his nephew contained sexually inappropriate content about female prison staff with instructions for his nephew to place the content on his internet website. Maki conducted a hearing later that month and upheld the charge. A similar incident occurred in June when Goldsmith attempted to

mail a second letter to his nephew with directions to place Goldsmith's sexually explicit writings about prison staff on his nephew's website. Maki conducted a hearing and found Goldsmith guilty.

In April 2008, Defendant Exelby searched Goldsmith's cell and confiscated additional writings, including a handwritten manuscript titled "Green Tag to Black So Hot It Sizzles." The manuscript included a magazine clipping of a semi-nude woman with the caption "meet Layla off duty prison guard." Maki conducted a hearing later in April and determined that the writing was meant to degrade female staff in a sexual manner. The charge was upheld and Goldsmith was denied permission to mail the manuscript to an outside recipient.

Finally, in July 2008, Goldsmith sent Carberry a note informing her that he believed she was allowing prisoners to masturbate in front of her and that her supervisors should "take some concern." Carberry wrote both sexual-misconduct and insolence-misconduct reports based on the incident. Maki conducted a hearing later that month, though Goldsmith's complaint does not provide the outcome of the hearing other than to state that the insolence charge was dismissed as being duplicative of the sexual misconduct charge.

Goldsmith was subsequently transferred to Marquette prison, as was Defendant Sharrett. Goldsmith contends that, since October 15, 2007, there has been a continuing and permanent ban on his writing.

## II.

This Court reviews the district court's ruling on a motion to dismiss based on statute of limitations grounds de novo. *Fallin v. Commonwealth Indus., Inc.*, 695 F.3d 512, 515 (6th Cir. 2012). In doing so, we construe the complaint in the light most favorable to the plaintiff, accepting his well-pleaded factual allegations as true, and drawing all reasonable inferences in

his favor. *See Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 562 (6th Cir. 2013). Additionally, complaints drafted by pro se parties are held to a less stringent standard than those drafted by lawyers. *Wagenknecht v. United States*, 533 F.3d 412, 415 (6th Cir. 2008).

A complaint need contain only a short and plain statement showing that the pleader is entitled to relief, but it must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). A claim for relief is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### III.

As an initial matter, Defendant Maki is entitled to immunity from money damages, as this Court has held that Michigan prison hearing officers are entitled to "absolute immunity from liability with respect to their judicial acts." *Shelly v. Johnson*, 849 F.2d 228, 229–30 (6th Cir. 1988) (per curiam). Judicial immunity is overcome in only two circumstances, neither of which Goldsmith argues: "First, a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9, 11–12 (1991) (per curiam) (citations omitted).

In actions brought pursuant to 42 U.S.C. § 1983, we apply the statute of limitations from the state's general personal injury statute. *See Owens v. Okure*, 488 U.S. 235, 249–250 (1989). The parties agree that a three-year statute of limitations applies to Section 1983 claims arising in

Michigan. *See Wolfe v. Perry*, 412 F.3d 707, 713–714 (6th Cir. 2005). The most recent events described in Goldsmith's complaint occurred in 2008. Accordingly, the district court concluded that his complaint dated January 30, 2012, was filed outside the limitations period. Rejecting Goldsmith's continuing-violation argument, the court stated simply that Goldsmith had failed to show how a continuing violation of his rights had occurred.

A "continuous violation" occurs, and will extend the limitations period, if the defendant engages in continuing wrongful conduct; injury to the plaintiff accrues continuously; and had the defendant at any time ceased its wrongful conduct, further injury would have been avoided. *Hensley v. City of Columbus*, 557 F.3d 693, 697 (6th Cir. 2009). When a continuing violation is identified, the court will "consider all relevant actions allegedly taken pursuant to the [defendant's] discriminatory policy or practice, including those that would otherwise be time barred." *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 408 (6th Cir. 1999) (citation omitted). The doctrine applies most frequently in the context of Title VII cases, and is rarely extended to § 1983 actions. *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir. 2003).

Goldsmith concedes that the incidents alleged prior to October 15, 2007, were not part of a continuing violation and it follows that his complaint was not timely with respect to those claims. He alleges that on October 15, however, the defendants instituted a complete and ongoing ban on his writing—thus, constituting a continuing violation of his rights under the First Amendment. In support of his continuing-violation argument, Goldsmith relies heavily on Carberry's statement during an October 15th administrative hearing: "[p]risoner being allowed to continue this writing will interfere with his rehabilitation." The Court finds Carberry's use of the phrase "*this* writing" telling, however. The writing at issue during that hearing was determined to describe criminal behavior. Neither Carberry nor any other defendant stated that

Goldsmith being allowed to continue *any* writing would interfere with his rehabilitation; the statement suggests, at most, that Goldsmith would not be permitted to write about criminal behavior.

Goldsmith also relies on this Court's decision in *Kuhnle Brothers, Inc. v. County of Geauga*, 103 F.3d 516 (6th Cir. 1997) in an attempt to bring his complaint within the continuing-violation doctrine. In that case, Geauga County enacted Resolution 91-87, which prohibited Kuhnle Brothers, a trucking company, from traveling a certain road that it had used previously to access a quarry. The Ohio courts subsequently ruled that the County was without the authority to enact a similar resolution and, thus, Geauga County stopped enforcing Resolution 91-87. Kuhnle Brothers brought suit against the County more than two years after Resolution 91-87 was enacted but less than two years after the County stopped enforcing Resolution 91-87. Evaluating each constitutional claim separately, this Court determined that, for the purposes of Kuhnle Brothers' substantive due process claim, if Kuhnle Brothers' claim was meritorious, "each day that the invalid resolution remained in effect, it inflicted 'continuing and accumulating harm' on Kuhnle." *Id.* at 522. In other words, Kuhnle was "actively deprived . . . of its asserted constitutional rights every day that [Resolution 91-87] remained in effect." *Id.* As Goldsmith points out, "a law that works an ongoing violation of constitutional rights does not become immunized from legal challenge for all time merely because no one challenges it within [the applicable statute of limitations]." *Id.*

The case at bar is very different from *Kuhnle Brothers,* however. First, in *Kuhnle Brothers,* the law at issue—Resolution 91-87—was determined to be unlawful. *See id.* at 518. Here, Goldsmith has failed to allege facts to establish that there was a ban on his writing that could possibly constitute a continuing violation of his constitutional rights. Rather, Goldsmith

alleges a series of discrete, easily identifiable incidents—i.e., individual seizures of his manuscripts followed by individual hearings. In *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 114 (2002), the Supreme Court contrasted a continuing violation with discrete acts that are "easy to identify." Continuing violations in the Section 1983 context are akin to hostile-work environment claims where the harm "cannot be said to occur on any particular day" and individual incidents are not actionable on their own. *Id.* at 115. A generous reading of Goldsmith's complaint reveals a host of significant discrete events.

To the extent Goldsmith alleges that he has been banned from writing altogether, he has failed to allege any facts which indicate that he is not free to pick up a pen and paper and resume writing. Goldsmith, however, is not free to write whatever he pleases. Because of the inherent problems involved in the operations of correctional facilities, prison administrators are afforded great latitude in the execution of practices and policies that "are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Accordingly, prison administrators, and not the courts, make the difficult decisions associated with day-to-day prison operations. *See Turner v. Safley*, 482 U.S. 78, 89 (1987). And an inmate's speech is not protected by the First Amendment if it is "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Certainly MDOC has a valid interest in regulating prisoners' writings that include sexually explicit content involving prison staff and the like.

## IV.

For the reasons stated above, we **AFFIRM** the judgment of the district court.